**Charles GUNBY, Jr., Appellant in 86–3707,**

v.

**PENNSYLVANIA ELECTRIC COMPANY, Appellant in 86–3723.**

**Nos. 86–3707, 86–3723.**

United States Court of Appeals, Third Circuit.

Argued July 6, 1987.

Decided Feb. 4, 1988.

Rehearing and Rehearing In Banc Denied March 4, 1988.

---

Stanley M. Stein (argued), Feldstein Grinberg Stein & McKee, Pittsburgh, Pa., for appellant in No. 86–3707.

Anthony De Sabato (argued), Charles J. Bloom, L. Oliver Frey, Kleinbard, Bell & Brecker, Philadelphia, Pa., for appellant in No. 86–3723.

Before HIGGINBOTHAM, BECKER, Circuit Judges, and BARRY, District Judge.*

## OPINION OF THE COURT

BECKER, Circuit Judge.

These are appeals from a jury verdict in favor of the plaintiff Charles Gunby in a race discrimination in employment case brought under 42 U.S.C. § 1981 and from the decree of the district court in a companion suit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*

The jury awarded Gunby $22,000 in back pay and $15,000 for emotional distress against his employer Pennsylvania Electric Company ("Penelectric"), on account of its failure to promote Gunby to another position. The district court, 631 F.Supp. 782, determined that the jury verdict precluded its determination of the Title VII claim and enjoined Penelectric from further discrimination against Gunby because of his race. The court declined, however, to upgrade Gunby's grade level position or to grant him an equivalent equitable remedy. Penelectric challenges the sufficiency of evidence to support the jury's verdict on both liability and damages. Gunby, in his cross-appeal, challenges the adequacy of the equitable relief awarded by the district court's disposition of the Title VII claim.

As to the § 1981 claim, we make three determinations. First, our review of the evidence persuades us that, although Penelectric mounted a strong defense, the jury heard sufficient evidence to have found by a preponderance of the evidence that Penelectric intentionally discriminated against Gunby. Second, we likewise conclude that the jury's back pay award must be sustained, because sufficient evidence existed for the jury reasonably to have determined the salary that Gunby would have received had Penelectric granted him the promotion at issue. Third, because there is no specific evidence that Gunby suffered an adverse reaction to Penelectric's failure to promote him to the position at issue in this lawsuit, there is an insufficient basis to sustain the jury's award for emotional distress. We reject the notion that damages may be presumed in such cases, and the inference that Penelectric's passing Gunby over *must* have had an adverse affect will not suffice. Accordingly, we must set aside the award for emotional distress.

Finally, we conclude that the district court erred in refusing to order any effective remedy for Gunby under Title VII. The Title VII verdict in Gunby's favor required a "make whole" remedy and the

* Honorable Maryanne Trump Barry, United States District Judge for the District of New Jersey, sitting by designation.

district court's order, which merely directed Penelectric to cease discrimination against him on account of his race, provided no such remedy. Because of the record's inadequacy on the issue of the relationship between grade level position and salary under Penelectric's personnel structure, we concede that it would have been difficult to know just how to fashion a remedy. However, neither the lacuna in the record nor the district court's broad equitable discretion in such matters justifies the absence of a meaningful remedy. Hence we reverse and remand, not only for further findings and concomitant equitable relief but also for possible development of the record on this point. The judgment of the district court will therefore be affirmed in part and reversed in part, and the case will be remanded for further proceedings consistent with this opinion.[1]

## I. INTENTIONAL RACE DISCRIMINATION

### A. *The Facts of Record*

Gunby, who has a Bachelor of Arts degree in psychology from the University of Pittsburgh and a Master of Arts degree in industrial relations from St. Francis College, has been employed by Penelectric's personnel operation since October 1973. Throughout his career at Penelectric, Gunby has been promoted steadily.[2] Additionally, at least until October 1982, Gunby received above average job performance evaluations.

This lawsuit centers on Penelectric's failure, in December 1982, to promote Gunby, a black man, from his job as Supervisor—Division Personnel Services—Corporate to the position of Manager—Employment and Equal Employment Opportunity and Affirmative Action ("Manager—Employment/EEO/AA").[3] The circumstances of Gunby's lateral transfer to the Supervisor—Division Personnel Services—Corporate job and of Penelectric's failure to promote him to the Manager job are the sinews of this appeal, and we will detail them here.

As Director of EEO/AA from 1976 to 1979, Gunby had the responsibility for directing Penelectric's EEO/AA program. Penelectric is a large company, hence this was an important responsibility. However, this position did not carry significant managerial responsibility or authority. Although his title changed in 1979 to EEO/AA–Manager, no change in job duties occurred.[4] As a result of conversations

---

1. Penelectric has also asserted that Gunby's § 1981 claim was time-barred. The claim concerns events that occurred in 1982. Gunby's complaint was filed in December 1984, outside the two year Pennsylvania statute of limitations applicable to § 1981. *Goodman v. Lukens Steel Company,* 777 F.2d 113 (3d Cir.1985), aff'd, —— U.S. ——, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). However, *Al–Khazraji v. St. Francis College,* 784 F.2d 505 (3d Cir.1986), aff'd, —— U.S. ——, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), specifically holds that courts should not give retroactive effect to this shorter limitations period for § 1981 actions that arose after 1977. We therefore reject the time bar claim, which was interposed as a good faith argument for a modification or reversal of existing law.

2. Gunby's first position with Penelectric was as Administrative Assistant–Personnel. In 1974 he was promoted to Administrative Assistant for Affirmative Action. In January 1976, Gunby was promoted to Director–Equal Employment & Affirmative Action. Penelectric promoted Gunby again in September 1979 to Equal Employment Opportunity and Affirmative Action–Manager. In August 1982, he was promoted to Staff Administrator–Human Resources, and in De-

cember 1982 transferred to Supervisor–Division Personnel Services–Corporate.

3. Penelectric's salary structure includes 26 grade levels. Higher grade levels reflect higher salaries, although salaries range so widely within each grade level that a salary at the high range of a low grade level may exceed a salary at the low range of a higher level. Gunby's Supervisor–Division Personnel Services–Corporate position was rated at grade level 16, and the Manager–Equal Employment Opportunity and Affirmative Action position was rated at grade level 20.

4. In August 1982, Gunby's title was changed again to Staff Administrator–Human Resources because Gunby complained that his equivalent job in Penelectric sister companies within the General Public Utility (GPU) system had been upgraded to grade level 17, but that he had not been similarly upgraded. Richard Gallatin, Director of Labor Relations, after checking with the Wage and Salary Committee, represented that the failure to upgrade was an oversight and that they would make the adjustment at that time. In August 1982, when Gunby was upgraded to a grade level 17, his salary was $3,080 per

with Richard Gallatin, Penelectric's Director of Labor Relations, Gunby was advised that his position in EEO/AA work would probably not lead to a managerial-level job at Penelectric. Gunby therefore made attempts to obtain jobs in other personnel departments so as to broaden his experience in personnel administration and make himself more "promotable."

When the position of Supervisor—Division Personnel Services—Corporate in Altoona, Pennsylvania, was posted, Gunby applied. However, Gunby did not receive an interview, and the position was filled in August or September 1982, by Gary Burkholder, a white accountant, formerly of the System Personnel Department's Compensation and Benefits Section, Wage and Salary Group. Burkholder had performed services of calculating pay raises based upon performance appraisals, but had had no experience in administering personnel benefits or in dealing with the other aspects of personnel administration.

When the Altoona job was filled by Burkholder, Gunby approached Gallatin, stating that he thought Burkholder was not qualified for the job, that he (Gunby) had been treated unfairly, and that he intended to contest Burkholder's qualifications for the job.[5] Shortly after making this complaint, Gunby was advised that a similar job had been created for him as Supervisor—Division Personnel Services—Corporate in Johnstown. At the time that Gunby was advised of this new position, he was told that his decision was needed immediately, and he accepted.

Gunby had not, however, been told that Penelectric had created the grade level 20 position of Manager–Employment/EEO/AA at the same time. Simultaneously with the announcement of the existence of this new position, James R. Reesman, Penelectric's Vice–President of Human Resources, announced that it would be filled by Frank Hager, another white male

accountant who had no experience in personnel administration or EEO/AA. Hager had worked at all times in the Accounting Department as an accountant. Prior to December 1982, he was a Senior Staff Accountant and prior to that had been Assistant to the Comptroller.

The new level 20 position subsumed all of the responsibilities of Gunby's previously held EEO/AA functions. Under Penelectric's procedures, because the job was a grade level 20 job, it did not have to be posted. Gunby, therefore, had no opportunity to apply for it. Penelectric maintains that Gunby was not given the job because he did not possess the qualifications of strong leadership and managerial qualities required.

According to Penelectric, the new position arose out of a two-stage reorganization of the Human Resources Department. The first phase was designed to create a personnel section for the corporate staff and to appoint a supervisor for that section. In doing so, Reesman consulted with Gallatin, Gunby's direct superior, and Oscar Zolbe, another senior Human Resources employee, to determine the best candidate for the new supervisor position. They agreed on Gunby, based on Gunby's background and his expressed desire to leave the EEO/AA area for more traditional personnel work. To deal with the technical demotion to grade 16 that would accompany the job, Reesman ordered that Gunby's pay not be reduced if Gunby accepted the position. The second phase of the reorganization was said to involve creation of several new positions and selection of persons to occupy them. The positions of Director of Personnel Services and Manager—Employment/EEO/AA were added to the Human Resources Department, the latter being the focus of this appeal.

Reesman made the decision to give the Manager—Employment/EEO/AA job to Hager.[6] According to Penelectric, Rees-

month, which was 95% of the mid-point of the grade level.

**5.** Gunby's complaint about the Altoona job was pressed in this lawsuit, but the jury found that

he was not discriminated against with respect to the Altoona job.

**6.** Penelectric also adduced evidence that Reesman's decisions were not racially motivated because: (1) he pioneered Penelectric's EEO/AA

man believed that Hager possessed managerial ability, was results-oriented, was aggressive and could get the job done, and also that Hager "had shown a deep commitment to EEO and Affirmative Action." Hager, on the other hand, was "shocked" to get the job, and was not expecting to get a job in the employment area.

The record as to Hager's background is somewhat opaque, at least with respect to managerial responsibilities.[7] Hager was a senior staff accountant in which position he apparently had the duty of "administration" of the 185–person accounting department. J.A. at 155. Although these duties were described as having some relationship to personnel, Hager testified that he had performed these duties when he was assistant to the Comptroller, so the jury could have concluded that they did not involve supervision of personnel. Hager only supervised two people—a word processing operator and an accountant, although when the Comptroller was absent he filled in for him and had additional responsibility.

In 1979, while Hager was still in the accounting department, he established a tracking system for monitoring affirmative action goals and timetables in that department. This monitoring system, consisting of a color-coded flow chart, was presented to Penelectric's President, who directed that it be used throughout the company. The Hager system was so well received that the entire General Public Utilities system of which Penelectric is a subsidiary later adopted it. In 1982, Hager was in charge of a three-million dollar construction program to refurbish Penelectric's offices. His success in these projects appears to be the key prop in Penelectric's case for Hager's superior managerial skill.

Gunby, however, adduced strongly countervailing evidence concerning his and Hager's relative capabilities. Gunby and other

Penelectric employees were subject to the Hay System of performance evaluation which rates an employee's performance in 18 categories on a scale from 1, for marginal employee, through 9, a distinguished employee. Gunby was rated at least annually by Richard Gallatin. The performance evaluations were tied directly to salary increases and were reviewed by Gallatin's superior, James R. Reesman, Vice President of Human Resources. These ratings do more than serve to compare the two men; they furnish positive evidence that Gunby possessed managerial skills, for many of the categories implicate managerial ability.

Hager was evaluated under the Hay System in December of 1981 as having a score of 4, or low competent, for the category of planning and organization. In contrast, Gallatin had rated Gunby as a 7, or commendable. By March 1982, the date of Hager's last evaluation prior to the job offer, he was still only a 5 in that category. Under the heading of analytical ability, where Hager was rated a 5, Gunby was rated a 7. Under initiative and self-motivation, where Hager was rated a 6, Gunby was rated a 7. The overall evaluation of Gunby for November 1981 showed that Gunby had six 7's (commendable), eleven 6's (highly competent), one 5 and no 4's. His average rating was 6.

In the evaluation of March 1982, although both Gunby and Hager were rated as overall 6's, Hager had no 7's at all. With one exception (a 5, or competent, for "creativity"), all of Gunby's evaluations were 6's or 7's for an overall evaluation of a 6 (high competent). Moreover, Hager had suffered a significant reduction in evaluation between December 1981 and March 1982, when he had received no 7's at all and seven 5's.

programs; (2) under his auspices, Gunby was hired to work in this area; (3) and when, in 1980, a merger of Penelectric and Metropolitan Edison Company was contemplated and Reesman was to be Vice–President of Human Resources after the merger, he prepared a reorganization plan for the to-be-created Human Resources Department, which designated James Rudolph, a black male, as Manager–Employment and EEO/AA.

7. Hager's entire background was in accounting. Prior to joining Penelectric, Hager had worked for a certified public accountants' firm in New York City and for Jersey Central Power & Light, where he worked on SEC regulations.

Penelectric stressed Gunby's October 1982 evaluation, which gave consideration to job management and working relationship criteria. With respect to planning and organization, Gallatin rated Gunby a 2 (below average) with a written comment that Gunby "[h]as had difficulty adjusting to a change in direction, i.e.: when a report on EEO activity for each office was needed." J.A. at 374. Gunby's rating for decision making and delegation, the other two management categories, were low average, 3's. With respect to working relationships, Gallatin rated Gunby a 2 (below average) on leadership with a written comment that Gunby "has had problems persuading others to provide data and information in a timely, accurate fashion." On the other factors bearing on working relationships, Gunby scored below average. J.A. at 374. Gunby pointed out, however, that this rating was made *after* his complaint about the Altoona job. He submits therefore that it is suspect.[8]

Gunby contended that the position description for the Manager—Employment/EEO/AA job indicated that much if not most of the new job's responsibilities were responsibilities that he already had. The first element of the Manager—Employment/EEO/AA job description, the "accountability objective," states that "[t]his position is accountable for providing management direction in the areas of Affirmative Action and an Equal Employment Program, employment policy, professional recruitment ... and personnel administration of various employee benefit programs...." J.A. at 337. The new position's job description is heavily the type Gunby had been carrying on before:

The [Manager—Employment/EEO/AA] is responsible for insuring that overall policy direction and operational coordination are integrated with corporate employment, equal employment opportunity and affirmative action goals and objectives and with the overall needs of the Company.

.    .    .    .    .

This position is responsible for assuring that the Company's employment and personnel policies, standards and practices are non-discriminatory.

.    .    .    .    .

This position is responsible for developing, implementing and monitoring the Company's Affirmative Action Program.

.    .    .    .    .

The incumbent provides interpretation and advice to assure consistent application of policy in the area of Equal Employment Opportunity and Affirmative Action. This includes reviewing and recommending appropriate modification of Company policies to insure that they are in compliance with EEO/AA laws.

This position must represent the Company tactfully, timely and effectively with the Office of Federal Contract Compliance; answering inquiries, forwarding documents or information and attending meetings when necessary. When these reviews uncover areas of concern, the incumbent formulates appropriate corrective action.

This position must establish relationships with minority oriented civic and business groups, recruit at minority colleges, [and] advertise in minority periodicals in order to insure that the Company is operating within the spirit of the Affirmative Action Program.

J.A. at 337–39.

Additionally, Gunby adduced evidence that Reesman could have been untruthful in his testimony. Reesman had claimed that an Affirmative Action Plan and Tracking System developed by Gunby was not approved by the federal government. However, Gunby's November 1981 performance evaluation, which Reesman had personally reviewed, showed not only that Gunby had prepared such a plan and that it had been approved by the federal government, but also that Gunby had been praised

---

**8.** It is noteworthy that the October 1982 ratings were Gunby's only poor ratings with Penelectric. Even Gunby's early performance evalua- tions were consistently above average, including mostly 4's and 5's and sometimes 6's and 7's.

for the preparation of the complicated statistics and documents.

The jury rejected Gunby's claim concerning the Altoona job, but found for Gunby on his claim that he was not given the position of Manager—Employment/EEO/AA because of his race. The jury awarded Gunby $33,000 back pay damages and $15,000 damages for emotional distress and humiliation. The district court then entered judgment on the Title VII claim, declined to upgrade Gunby's title and position and, as equitable relief, simply enjoined Penelectric from further discrimination. Gunby appealed from the court's Title VII orders, and Penelectric appealed the jury's verdict and failure of the court to grant a new trial or judgment notwithstanding the verdict.

### B. Discussion
#### 1. Legal Standards

The legal standards governing sufficiency of proof in § 1981 and Title VII cases are well established and no purpose would be served in rescribing them here except in capsule form.[9]

■ In order to succeed, plaintiff must prove intentional discrimination by a preponderance of the evidence. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Gunby first had the burden of proving a prima facie case of discrimination. To establish a prima facie

case, Gunby had to prove (1) that he is a member of a racial minority; (2) that he was qualified for the job; and (3) that the job was given to a member of another race. *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). Penelectric then was required to articulate a legitimate, nondiscriminatory reason for its actions. Finally, if Penelectric articulated a nondiscriminatory reason, Gunby had to prove that Penelectric's reason was a mere pretext for intentional race discrimination. *Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175, 179 (3d Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986). At all points in the trial, Gunby retained the burden of proving that he would have received the position but for his race. *Lewis v. University of Pittsburgh*, 725 F.2d 910, 915–16 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984).[10]

#### 2. Prima Facie Case and Nondiscriminatory Reason

At the threshold, Penelectric contends that Gunby did not establish a prima facie case because his evidence does not support the conclusion that he was qualified for the level 20 Manager–Employment / EEO/AA position. The job description states that the position is accountable for "providing management direction" in a number of areas and gives the incumbent supervisory authority over senior and intermediate level administrators, and Reesman testified

---

**9.** In *Lewis v. University of Pittsburgh*, 725 F.2d 910 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984), we held that the legal standards established in § 1981 cases and Title VII cases are interchangeable.

**10.** We note that the Supreme Court stated in *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed. 2d 403 (1983), a case such as the one *sub judice* that had been tried on the merits, that courts should focus on the ultimate determination of discrimination rather than continue to engage in a *Burdine*-type burden shifting analysis. The Court stated that "it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a prima facie case. We think that by framing the issue

in these terms, they have unnecessarily evaded the ultimate question of discrimination *vel non.*" *Id.* at 714, 103 S.Ct. at 1481 (footnote omitted).

This opinion reflects our cognizance that the ultimate question is whether Penelectric intentionally discriminated against Gunby in violation of Title VII. We have proceeded with a review of the burden shifting only because: (1) the language of burden shifting is so infused in Title VII jurisprudence that clarity may often be achieved by a consideration of such terms; (2) counsel have argued the case in burden shifting terms; and (3) one element of the final analysis, Gunby's qualification for the level 20 position, is an element of the prima facie case.

that it was essential to fill the position with someone who had strong managerial skills and a proven track record of strong management.

██ The record supports Gunby's contention that he had the experience to fully satisfy the job description, however. First, Gunby had already successfully performed all of the EEO/AA duties, which were a significant facet of the job. Focusing briefly on a few of the responsibilities of the position, he had prepared statistical background information and documentation for presentation to the Labor Department, work that Gallatin acknowledged was "complex and complicated," and he had educated Penelectric employees and the community on the principles and objectives of the AA program by holding training classes, by going out into the community surrounding Penelectric facilities and informing community groups and organizations about the company's program, and by recruiting minorities and women to apply for jobs at Penelectric. Further, he had engaged in recruiting at various college campuses and provided workshops and seminars on EEO/AA.

With his masters degree, Gunby more than sufficiently met the educational prerequisites for the position. Moreover, his prior training and experience provided him with the "detailed knowledge of equal employment opportunity/affirmative action laws and the ability to integrate Company needs and policies with state and federal requirements to ensure that the Company's obligations in the employment and promotional opportunities areas are consistent with those laws." J.A. at 339. The job description further required the incumbent to "represent the company tactfully, timely and effectively with the Office of Federal Contract Compliance [OFCCP]," and Gunby had been praised on his November, 1981, evaluation for developing "a good relationship with OFCCP representative ... during the on-site compliance review."

Turning to the question of managerial ability, Gunby's November 1981 employee performance evaluation, done by Gallatin, showed good marks in categories such as working relationships, professional attitudes, communications, determination, initiative and self-motivation, job knowledge and analytic ability, planning and organization, and especially leadership qualities. All of these matters implicate managerial ability. Gunby's steady increase in EEO/AA responsibility and success, culminating in the negotiation and acceptance by the OFCCP of the company's affirmative action plan in 1981, coupled with Penelectric's appointment of Gunby in December 1982 to the management of all personnel benefits for 750 corporate officers and employees, tends to demonstrate that he possessed managerial capability. Gunby testified that his managerial ability had been complimented by his supervisors, and neither Reesman nor Gallatin testified that they had ever criticized Gunby's management ability prior to trial.

For the foregoing reasons, we conclude that Gunby demonstrated his ability to perform the job in question, hence established a prima facie case. There is no question that Penelectric met its burden, at the second stage of the proof of establishing a legitimate business reason for its decision; the facts favoring Penelectric described above suffice in this regard. Therefore, we turn to the question whether Gunby met his burden of establishing that Penelectric's justification was a pretext or sham.[11]

### 3. Proof of Pretext and Intentional Discrimination

In *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir.1987) (in banc) we established that

> plaintiff's ultimate burden of persuasion includes the requirement to show that the defendant's proffered reason is a pretext for discrimination, i.e., that the proffered reason is merely a fabricated justification for discriminatory conduct. [*Texas Dep't. of Community Affairs v.*] *Burdine*, 450 U.S. [248] at 257 [101 S.Ct.

---

**11.** Our scope of review on this point is, of course, extremely deferential—whether there was sufficient evidence on which the jury could have rationally based a verdict.

1089 at 1095, 67 L.Ed.2d 207].... The plaintiff may meet this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or indirectly by showing that the employer's proffered explanation is unworthy of credence."* Id. at 256 [101 S.Ct. at 1095] (emphasis added).

Because the only "black mark" on Gunby's employment record is the October 1982 performance evaluation, a threshold issue is whether the jury could conclude that the performance evaluation was a sham. The October 1982 evaluation found Gunby unfit for a management position because he allegedly failed to perform certain unspecified assignments, and obviously that evaluation, if credited, would strongly support Penelectric's position.

■ However, this performance evaluation was prepared by Penelectric a month *after* Gunby had expressed his displeasure with the fact that Gary Burkholder had been given the Altoona job. Gunby complained that Burkholder, a white male employee from the accounting department, had been given a personnel job for which Gunby was qualified and had expressed a desire to be considered, but for which he was denied an interview. Gunby's evaluation was completed in late October 1982, the same time that Reesman claims to have decided to give the level 20 managerial job to Hager. J.A. at 253, 373. Although Gallatin claimed that he had conversations with Gunby about Gunby's alleged failure to fulfill certain assignments and projects in 1980 and 1981, no criticism appears on any of Gunby's performance evaluations, including the November 1981 evaluation, until October 1982. J.A. at 212–19. Against the background of nine years of excellent performance and regular promotions, we believe that the jury could have concluded that Penelectric had a motive in October 1982, to evaluate Gunby's performance unfairly in order to justify the fact that it had appointed a white accountant with little prior experience in personnel administration and EEO/AA to a respon-sible management position in personnel for which Gunby was particularly qualified.

Another factor casts considerable doubt upon the October 1982 performance evaluation. The evaluation stated that Gunby caused his supervisor frustration because he failed to complete certain unspecified assignments. At about the same time, Gallatin considered Gunby a "natural" for the corporate personnel administration job which involved administration of personnel matters for 750 corporate employees, a job not likely to be given to an employee who allegedly failed to complete assignments. J.A. at 201.

Given the facts set forth at considerable length above, we think that the jury could have concluded that Gunby was better qualified for the level 20 position than Hager and that Penelectric's alleged nondiscriminatory reasons for not promoting Gunby to the position were a sham. Gunby surely had had more education and job responsibility in the personnel and EEO/AA field than Hager. Indeed, from the position description the jury could reasonably have concluded that EEO/AA, the area of Gunby's expertise, was a principal responsibility of the level 20 job, and that that was an area in which Hager had virtually no experience. The jury could further have concluded that the EEO/AA commitment ascribed by Penelectric to Hager could not properly be deduced from his production of an accountant's color-coded flow chart, however well done. There being no other evidence on the point, the jury might have thought that the claim of "commitment" was a pretext.

The critical remaining issue is, of course, management skill. Reesman claimed that he was looking for someone with "proven" management capability—capability that Hager supposedly had, but Gunby did not. We think, however, that the jury could reasonably have concluded that this proffered reason rang false.

First, it is important to place the managerial question in perspective. The new Manager–Employment/EEO/AA position which Gunby claims he was denied because of his race only involved the direct supervi-

sion of four people. Second, a comparison between Gunby's November 1981 evaluation and Hager's November 1981 and March 1982 performance evaluations showed that, despite Penelectric's contention that Hager had done a good job with the refurbishment of the office, Hager's performance had been downgraded during the period of time he managed the refurbishment. He had not only been rated lower in March 1982 than he had been rated in November 1981, but he had been rated *significantly* lower than Gunby had been in the various performance categories. J.A. at 345–46; *compare* J.A. at 346 *with* J.A. at 353. Therefore, Penelectric's claim that Hager had done a superlative job and evidenced great managerial ability during the refurbishment project could have been rejected by the jury in light of the reduction in his performance evaluation between December 1981 and March 1982, the period covered by the planning of the refurbishment project.

Moreover, Hager's alleged managerial ability evidenced itself in a job in which his primary function was accounting—to make sure that the refurbishment expenses remained within budget and that new office space was properly allocated among departments. The jury could have concluded that managing an office reconstruction project is *not* like managing subordinate personnel. Hager directly supervised only two people, one a word processing person. Moreover, there was no evidence that Hager ever exhibited any management capability in the field of personnel administration or EEO/AA, and Reesman's oral testimony that Hager, who had only been rated as a 4, low competent, in planning and organiza-

tion, possessed management skills was uncorroborated by any document. J.A. at 175.

Gunby's responsibilities and ratings, described at length, *supra* pp. 1113–14, provide evidence from which the jury could have concluded that Gunby possessed management skills. Significant in the record is that he was awarded the corporate personnel administration job, which involved administration of personnel matters for 750 corporate employees. Although both Gunby and Hager had primarily been administrators, given their relative responsibilities Gunby would seem to have been at least as qualified in overall planning and execution as Hager.

To the extent that managerial and administrative functions differ, a manager must demonstrate a greater capacity for supervising the work of others and achieving stated goals.[12] The jury could have determined that Gunby possessed sufficient management skills and that Hager's were predominantly administrative, and thus the jury could have determined that Gunby was the better manager, even though Hager might have been the better administrator. In our view, the jury was entitled, on the basis of the foregoing, to find Penelectric's claim that Gunby was much less qualified than Hager to be pretextual.

Other facts support Gunby's intentional discrimination showing. But above all, we think that there was evidence that would support a conclusion by the jury that the manner in which Penelectric dealt with Gunby commencing in September 1982, reflected a discriminatory stratagem. Given the evidence described above about the rel-

---

**12.** We need not enter into a discourse about the difference between administration and management. The literature in the field is extensive and reflects no clear line. It is plain from the literature, however, that the work of administrators and managers overlaps considerably. *See, e.g.,* Turem, *The Call for a Management Stance,* Social Work, September, 1974 at 615, which defines management as:

the purpose control and direction of resources to achieve stated goals. This definition includes goal orientation and decision-making aimed at the goals.
\* \* \* \* \* \*

*Administration* is often used synonymously with management, but this article will make a distinction. Administration is defined as the process of management. It provides the goals and techniques for collecting necessary information and for controlling and enforcing decisions about how to allocate resources. *See also* Roberts' Dictionary of Industrial Relations, 407 (3rd ed. 1986) (defining managerial employees to be

"employees who 'formulate and effectuate management policies by expressing and making operative the decisions of their employer' ").

ative qualifications of Gunby and Hager for the level 20 position (including the evidence suggesting that the October 1982 performance evaluation may not have been above board), the jury might have concluded that offering Gunby the corporate level job and insisting on an immediate reply, and not announcing the level 20 management position until he had accepted the corporate level position was a strategy designed to keep a black man from obtaining the level 20 management position. We underscore that we do not declare that that is what happened. We do, however, believe that a jury could have so concluded from the evidence.

We held in *Chipollini* that a "plaintiff may meet [the burden of showing that the defendant's proffered reason was pretextual] 'either directly by persuading the court that a discriminatory reason more likely motivated the employer *or indirectly by showing that the employer's, proffered explanation is unworthy of credence.'*" 814 F.2d at 898 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095) (emphasis added in *Chipollini*). Viewing the facts in the light most favorable to the plaintiff, as we must, we conclude that these burdens have been met here, and, further, that the jury could have found that Gunby met his burden of showing that, "but for" his race, he would have received the position. *See Lewis v. University of Pittsburgh*, 725 F.2d at 914.

## II. SUFFICIENCY OF EVIDENCE OF BACK PAY

### A. *The Facts of Record*

The record contains information relating to Gunby's and Hager's salary levels from the date of the discriminatory conduct to the date of trial. In addition, the record contains documents showing the high-, low-, and mid-point salary levels for all job levels (including levels 16 through 20) for all years from 1980 to the date of trial (1986) and showing that Gunby's salary level at the time of the discriminatory conduct was at the mid-point of his salary range.

The relevant time period for consideration of this issue is December 1, 1982, the date of the conduct found to be discriminatory, to October 27, 1986, the date of the jury verdict.[13] Also relevant to the back pay determination are the facts that: (1) Gunby had received a higher evaluation in November 1981 than Hager had received in March 1982; and (2) that Gunby's ratings were well above average.

Finally, Penelectric has made certain submissions in support of its (alternative) contention that, even if Gunby is entitled to back pay, it should not have exceeded $8,062. Hager received an increase of 5% on December 1, 1982 when he became Manager–Employment/EEO/AA. Penelectric maintains that had Gunby received that position he would have received at most a similar 5% salary increase on December 1, 1982. Thereafter, Gunby actually received a 4% salary increase on January 1, 1983, and 5% increases on January 1, 1984, 1985, and 1986. Penelectric submits that if these percentage increases are applied to plaintiff's adjusted salary, the result is a salary difference of $8,062.

### B. *Discussion*

■ A successful § 1981/Title VII plaintiff is entitled to back pay. The appropriate standard for the measurement of a back pay award is to take the difference between the actual wages earned and the wages the individual would have earned in the position that, but for discrimination, the individual would have attained. *E.E.O.C.*

13. The actual figures are as follows:

GUNBY'S SALARY

| | | Monthly | Yearly |
|---|---|---|---|
| 1982 | (JA, p. 108) | 3080 | 36,960 |
| 1983 | (JA, pp. 129, 351) | 3203 | 38,436 |
| 1984 | (JA, pp. 129, 351) | 3363 | 40,356 |
| 1985 | (JA, pp. 129, 350) | 3531 | 42,372 |
| 1986 | (JA, p. 129) | 3708 | 44,496 |

HAGER'S SALARY

| | | Monthly | Yearly |
|---|---|---|---|
| 1982 | (JA, pp. 127, 341) | 4185 | 50,220 |
| 1983 | (JA, p. 341) | 4352 | 52,224 |
| 1984 | (JA, p. 130) | 4526 | 54,312 |
| 1985 | (JA, p. 130) | 4775 | 57,300 |
| 1986 | (JA, p. 130) | 5014 | 60,168 |

*v. Eazor Express Co.,* 499 F.Supp. 1377, 1388 (W.D.Pa.1980), *aff'd mem.,* 659 F.2d 1066 (3d Cir.1981). Penelectric asserts that Gunby is unable to satisfy this standard because there is no evidence of the amount Gunby would have earned had he received the Manager position. Gunby's grade 17 salary was well within the range of salaries available in grade 20. Therefore, in Penelectric's submission, Gunby did not prove that there would have been a difference in his salary had he received the job at issue.

█ We disagree. Rather, having in mind that the jury found Gunby entitled to a position that is 4 grade levels above his former position and that Gunby's performance evaluations were higher than Hager's, we believe that the jury, based on all the information available to it, could have determined that Gunby would have received the same amount that Hager received or some amount higher than Gunby was receiving at grade 17. Also relevant in this regard is the documentary evidence that in 1982 Gunby was at a salary level below his mid-point range, whereas Hager's $50,220 salary was over the mid-point of his salary range by almost $6,000 and substantially exceeded the mid-point each year thereafter.

The jury was free to award a reasonable amount that was within the company's own guidelines and fair under the circumstances, taking into account the qualification of the two employees and their performance. Cf. *Goss v. Exxon Office Systems Co.,* 747 F.2d 885 (3d Cir.1984) (holding that the wrongdoer bore any risk of the uncertainty of the aggrieved plaintiff's award). As even a quick glance at the salary data set forth *supra,* note 13, will demonstrate, the $22,000 awarded was easily deducible and plainly reasonable.

Alternatively, Penelectric argues that the proper measure of damages is the same *percentage* increases earned by Hager when he assumed the job sought by Gunby. Appellee's Br. at 23. According to Penelectric, these percentage increases would support a jury verdict of no more than $8,062.

Penelectric maintains that the jury erred when it awarded Gunby the difference between the amount Gunby earned and the amount Hager earned, because Hager entered the new job with a higher salary level than Gunby would have if he had been selected for the position. In essence, Penelectric asserted that the newly created job's salary should be viewed as a percentage increase over the prior salary of the employee who filled it, and not as the specific amount earned by Hager.

Gunby responds that the jury was not restricted to awarding the percentage increases asserted on appeal by Penelectric. Instead, the jury had extensive salary information before it, including Gunby's salary and Hager's salary at the time of the discriminatory conduct and in the succeeding periods, and documents demonstrating the high-, low-, and mid-point salary amounts for grade levels 16 to 20. Gunby asserts that the jury could reasonably have concluded that Gunby would have received a raise over and above the percentage increases Hager received as a result of the new position. We agree, and therefore will affirm the back pay award.

### III. DAMAGES FOR EMOTIONAL DISTRESS

#### A. *The Facts of Record*

The only specific evidence relating to Gunby's emotional distress resulting from his treatment by Penelectric related to being passed over for the job in Altoona. On direct examination, Gunby testified that he told Gallatin that "I had been done wrong" and that "I had been treated unfairly." Gunby also testified that he felt he "had been treated unjustly and that [he] was going to contest [the successful applicant's] qualifications." J.A. at 115–16. Additionally, Gallatin on direct examination testified that Gunby was "very upset" when informed of Penelectric's decision not to interview him for the Altoona position. Gunby, however, offered no specific evidence of emotional distress related to his

being passed over for the managerial job that went to Hager.

### B. *Discussion*

■ As noted above, the jury awarded Gunby $15,000 damages for emotional distress and humiliation resulting from Penelectric's actions. General compensatory damages are available under § 1981, *see Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed. 2d 295 (1975); *Easley v. Anheuser–Busch, Inc.*, 758 F.2d 251, 263 (8th Cir.1985), and such damages may include compensation for emotional pain and suffering. *See Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1238 (D.C.Cir.1984); *Williams v. Trans–World Airlines*, 660 F.2d 1267, 1272 (8th Cir.1981). The plaintiff must present evidence of actual injury, however, before recovering compensatory damages for mental distress. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (compensatory damages recoverable in § 1983 actions); *Spence v. Board of Education of Christina School District*, 806 F.2d 1198, 1200 (3d Cir.1986) (emotional distress damages may not be presumed in first amendment action); *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir.1985) ("competent evidence" must support award for compensatory damages in § 1981 action); *Erebia v. Chrysler Plastics Products Corp.*, 772 F.2d 1250, 1259 (6th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986) ("there must be sufficient evidence to support the award"); *Block v. R.H. Macy & Co.*, 712 F.2d 1241, 1245 (8th Cir.1983) (damages for mental anguish awardable where supported by evidence including sleeplessness, anxiety, embarrassment, and depression).

Penelectric maintains that Gunby introduced no evidence of emotional distress. Further, Penelectric argues that Gunby was unaware that the new position was being created and, thus, that his rejection could not have caused him mental anguish. We agree with the contention that Gunby presented no evidence upon which the jury could reasonably conclude that he had suffered emotional distress as a result of being denied the position of Manager–Employment/EEO/AA. Gunby urges us to assume that the jury could have inferred that he was just as humiliated by not receiving the Manager job as by not receiving the Altoona job. He analogizes this case to the defamation cases and suggests that the declaration of inferiority implicit in Gunby's being passed over and the concomitant adverse effect on his employment record justify *per se* treatment. Finally, Gunby argues that we should rely on *Williams v. Trans–World Airlines*, 660 F.2d 1267 (8th Cir.1981), *Smith v. Anchor Building Corp.*, 536 F.2d 231 (8th Cir.1976), and *Seaton v. Sky Realty Co.*, 491 F.2d 634 (7th Cir.1974), as support for allowing the jury to infer emotional distress from the circumstances.

■ We decline Gunby's invitation to presume damages as though this case involved defamation rather than employment discrimination. The justifications that support presumed damages in defamation cases do not apply in § 1981 and Title VII cases. Damages do not follow of course in § 1981 and Title VII cases and are easier to prove when they do. *Cf. Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978) ("although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983 ... neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused"). Although it is necessary in § 1981 and Title VII cases that compensatory damages be provided, speculative damages will not be awarded. "Courts have allowed recovery under Section 1981 for emotional distress, *but there must be sufficient evidence to support the award.*" *Erebia*, 772 F.2d at 1259 (emphasis added). The cases cited by Gunby all involved direct and substantial evidence of humiliation or emotional injury. *See, e.g., Block*, 712 F.2d at 1245 (plaintiff testified that she was unable to obtain employment

for thirteen months, that she had to borrow money from relatives to sustain her family, that as a result of her financial difficulties she suffered sleeplessness, anxiety, embarrassment and depression); *Smith,* 536 F.2d at 236 (plaintiff's testimony that she was "embarrassed" and "really hurt and humiliated" supported claim for emotional distress damages); *Williams,* 660 F.2d at 1272 (plaintiff's testimony regarding mental distress adequate to support damage award where found by the district court to be credible). In *Seaton v. Sky Realty Co.,* although the Court of Appeals for the Seventh Circuit suggested in dictum that humiliation could be "inferred from the circumstances," its affirmance of emotional distress damages was supported by testimony "that the plaintiff ... suffered great embarrassment because of the action of the defendants." 491 F.2d at 636. In contrast, there is no evidence of Gunby's emotional distress about the new Manager–Employment/EEO/AA job in the record. Because Gunby presented no evidence that he suffered any emotional distress as a result of the loss of the level 20 job, the verdict for emotional distress must be set aside.

## IV. ADEQUACY OF EQUITABLE RELIEF

The district court heard the Title VII case without a jury but made no independent findings, considering itself bound by the findings of the jury.[14] It therefore proceeded to a determination of appropriate equitable relief.

Title VII provides broad equitable discretion, which courts must exercise " 'in light of the large objectives of the Act.' " *Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 226, 102 S.Ct. 3057, 3062, 73 L.Ed.2d 721 (1982)

(quoting *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975)). The primary objective of Title VII is the elimination of discrimination in the workplace. A central purpose of Title VII relief is "to make persons whole for injuries suffered on account of unlawful employment discrimination," *Albermarle Paper Co.,* 422 U.S. at 418, 95 S.Ct. at 2372, and to restore the plaintiff as fully as possible to the position he otherwise would have been in absent discrimination. *See Franks v. Bowman Transportation Co.,* 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1263–64, 47 L.Ed.2d 444 (1976); *Gurmankin v. Costanzo,* 626 F.2d 1115 (3d Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1981); *Rodriguez v. Taylor,* 569 F.2d 1231 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978) (age discrimination).

The district court obviously wrestled with the question of relief. It resolved its doubts by making the following conclusions of law:

2. It would be equitable, under the circumstances of this case, to enjoin defendant from engaging in any employment practice that discriminates against the plaintiff because of his race.

3. Under the circumstances of this case, it would not be equitable to upgrade plaintiff's present title and position, which is a Grade Level 16 position, to a Grade Level 20 position and title with corresponding benefits and privileges, because all such similar positions within the defendant's company are Grade Level 16 positions.

J.A. at 383.

Although the district court's statement in paragraph 3 is somewhat cryptic, we be-

---

**14.** The district court cited *Lincoln v. Board of Regents of the University System of Georgia,* 697 F.2d 928, 934 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983), and *Sisco v. J.S. Alberici Construction Co.,* 655 F.2d 146, 151 (8th Cir.1981), *cert. denied,* 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982), for the proposition that the jury's § 1981 determination is preclusive as to the plaintiff's Title VII

claim. We note that the weight of authority supports this position. *See Garza v. City of Omaha,* 814 F.2d 553 (8th Cir.1987); *King v. Alco Controls Div. of Emerson Electric Co.,* 746 F.2d 1331 (8th Cir.1984); *Goodwin v. Circuit Court,* 729 F.2d 541, 549 n. 11 (8th Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 112, 83 L.Ed.2d 55 (1984). Because it is not in dispute, however, we need not reach it here.

lieve that it was troubled by the inherent difficulty in fashioning equitable relief imposed by Penelectric's personnel system. As discussed *supra,* Penelectric employees hold positions according to a 20 level structure. Each grade level corresponds to a salary range, with a minimum, maximum and median. These salary ranges are not mutually exclusive; they overlap. An order to upgrade a Penelectric employee to level 20 would be to give a promotion without knowing exactly what that amounts to. The problem is complicated by the fact that Gunby already makes what could be a grade level 20 salary, albeit a low one.

■ Penelectric argues that the law is clear that Congress has vested the fashioning of appropriate remedies in the sound equitable discretion of the district court, which is in a better position than an appellate court to determine the equitable relief necessary. Gunby rejoins by pointing out that this discretion must be exercised with purpose and direction. In exercising its discretion to determine proper relief, the district court must adhere to the dictates of Title VII. *See Albermarle Paper Co.,* 422 U.S. at 416, 95 S.Ct. at 2370.[15] We agree.

In *Franks v. Bowman Transportation Co.,* the Supreme Court held that the denial of seniority relief to victims of illegal race discrimination is permissible only for reasons that " 'would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.' " 424 U.S. at 771, 96 S.Ct. at 1267 (quoting *Albermarle Paper,* 422 U.S. at 421, 95 S.Ct. at 2373). In light of *Franks* we must review the district court's exercise of discretion in terms of its effect on Title VII's objective of making the plaintiff whole and uphold that exercise only if the denial of relief does not frustrate this objective.

■ In our view, the district court's grant of relief in this case fails to make Gunby whole for the injuries he suffered as a result of Penelectric's unlawful discrimination. A grade level 20 position may carry with it a significant salary boost from a grade level 16 position, although, as noted above, the salary ranges overlap. A grade level 20 position also carries with it additional insurance benefits and other benefits such as better surroundings, accommodations and prestige.

Gunby does not seek to have Hager removed from his position. In a post-trial motion to reconsider relief, Gunby presented alternative remedies that the court could have utilized to fashion an effective and adequate Title VII relief. These alternative remedies could have included the future promotion of Gunby to a similar grade level 20 position and a raise in salary equal to that of a grade level 20 position until such time as a grade level position for which he is qualified becomes available.[16] The district court, however, simply denied

---

15. Although this relief presumptively takes the form of back pay, it is not limited to back pay. For example, "front pay," a monetary award ending on the date the plaintiff regains his position lost because of the discrimination rather than ending on the date of the order granting relief, may also be granted. *See James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 358 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). Class-based retroactive seniority was ordered by the Supreme Court in *Franks,* 424 U.S. at 779, 96 S.Ct. at 1271. Retroactive promotion may be ordered if the district court finds that the plaintiff "would have attained that position but for the defendant's unlawful employment practices." *Richerson v. Jones,* 551 F.2d 918 (3d Cir.1977) (retroactive promotion remanded where the district court did not make such finding). A grant

of tenure was ordered by this court in *Kunda v. Muhlenberg College,* 621 F.2d 532, 549 (3d Cir. 1980), predicated upon the plaintiff's completion of a required masters degree.

16. Gunby's proposal is quite specific:

Since the evidence indicated that the staff position of Manager–Equal Employment Opportunity and Affirmative Action as of January 1, 1983, carried with it, as a job level 20, a minimum salary of $37,319, which was lower than the maximum salary range for a level 16 job, the court could have ordered an increase in Gunby's salary to $43,879, the maximum salary level for a level 16 until such time as a level 20 job for which he was qualified was available.

J.A. at 366.

relief without considering these remedies, and Gunby appeals the denial.

As we have already suggested, the trier of fact could make a determination as to what Gunby's salary would likely have been by considering factors such as his performance evaluations, where he already was within grade and similar information with respect to Hager. Since such an alternative remedy would be the only way to make Gunby whole in light of the verdicts, it is necessary that we remand to the district court for further findings (and further evidence if necessary) on Penelectric's salary structure and where Gunby would likely have fit within it had he been awarded the grade level 20 position.[17]

## V. CONCLUSION

For the foregoing reasons, we will affirm the jury's award of back pay and reverse the award of emotional distress damages. Because we hold that Title VII requires "make whole" relief, we will vacate the district court's equitable relief order prohibiting future discrimination against Gunby and remand for further findings, development of the record and an order granting full equitable relief.

**17.** We note that the court in *Carter v. Community Action Agency*, 625 F.Supp 199 (M.D.Ala. 1985), fashioned an alternative remedy where an innocent employee had filled the position the plaintiff was denied because of race discrimination. The court ordered the employer to place the plaintiff in a position with salary and responsibilities comparable to her former position, or, in the event no such position was available, the court ordered that the plaintiff be awarded front pay.

Interim changes within the company may also suggest other, similar, options.