**Loretta DADINO, Plaintiff,**

v.

**DELAWARE RIVER PORT AUTHORITY, Defendant.**

**Civ. A. No. 85–0334.**

United States District Court,
D. New Jersey.

Aug. 25, 1988.

---

Arlene Gilbert Groch, Somers Point, N.J., for plaintiff.

Koslov, Seaton & Romanini, P.C. by: Dante J. Romanini, Cherry Hill, N.J., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge.

### I. INTRODUCTION

Plaintiff Loretta Dadino instituted this action in January of 1985, alleging that her former employer, the Delaware River Port Authority ("DRPA") discriminated against her because of her sex. Plaintiff's original complaint alleged causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983, as well as various state law claims.

The seven-day trial of this matter commenced on April 11, 1988 before a jury. The jury, however, was dismissed on April 14, 1988, after four days of testimony, when plaintiff withdrew her § 1983 and state law claims.[1] Consequently, to determine the rights and liabilities of the parties to this lawsuit, the court must serve as both the trier of fact and the arbiter of the applicable law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Loretta Dadino was fired from her job at the DRPA in 1982, after admitting that she had falsified her expense account records. It is undisputed that plaintiff knowingly misstated information on expense account vouchers in order to obtain reimbursements to which she was not entitled. There is also no serious doubt that strong evidence existed, before, during and after the time of plaintiff's termination, which implicated certain male employees of the DRPA in expense account fraud similar to that perpetrated by plaintiff. None of these men, however, were fired.

The DRPA contends that it had valid, non-discriminatory reasons for firing plaintiff and not firing the men. Plaintiff argues that these proffered reasons are mere pretext, and that the DRPA treated her more harshly than her male counterparts, simply because she is a woman.

The court now makes the following findings of fact and conclusions of law.

### II. FINDINGS OF FACT

1. The DRPA is a bi-state agency, created by the states of New Jersey and Pennsylvania, with the approval of the federal government. TT, 4/14/88 at 114.[2] The mandate of the DRPA is to perform three separate functions: (1) to build and maintain river crossings spanning the Delaware River; (2) to create high-speed interstate transportation between Pennsylvania and New Jersey; and (3) to promote commerce on the Delaware River. *Id.*

---

**1.** Title VII does not provide a right to trial by jury.

**2.** Citations to TT refer to the trial transcript.

2. In furtherance of the above-enumerated purposes, DRPA built four bridges linking Pennsylvania to New Jersey, constructed the PATCO high-speed line, and created the World Trade Division ("WTD"). *Id.* at 114–115.

3. All of the foregoing operations are funded through the issuance of revenue bonds and the collection of tolls and fares from the bridges and PATCO line.

4. DRPA policy is set by a Board of Commissioners, which is composed of eight persons from New Jersey and eight persons from Pennsylvania. All eight New Jersey commissioners are appointed by the Governor of that State and confirmed by the New Jersey Senate. Six of the Pennsylvania commissioners are appointed by the Governor of that state without confirmation by the senate. The remaining members are the Treasurer and the Auditor General of Pennsylvania. *Id.* at 124.

5. Loretta Dadino was hired by the DRPA as a secretary in 1954. She continued to work in that position until 1956, at which time she married and left her job. TT, 4/13/88 at 133.

6. Thereafter, in February of 1961, plaintiff returned to the DRPA and resumed work as a secretary for the WTD. *Id.* Approximately six months after her return, plaintiff became the secretary for James R. Kelly. *Id.* Plaintiff worked for Kelly for nineteen years, until he became the President of the DRPA. *Id.*

7. In 1980, plaintiff became the Manager of Port Promotion for the WTD. TT, 4/13/88 at 136; TT 4/14/88 at 117. This new position was specifically created for plaintiff, TT, 4/13/88 at 136, and made her the first female ever to obtain a managerial position with the DRPA. *Id.* at 137.

8. As part of her new position, plaintiff was given an expense account, TT, 4/13/88 at 138; TT, 4/14/88 at 117, to be used, in accordance with DRPA rules and regulations, for certain business-related activities. P–4.[3]

9. Although this was the first time she had ever had an expense account at the DRPA, plaintiff had become familiar with the procedures by which expense account records were submitted. TT, 4/13/88 at 139. Plaintiff also was familiar, at the time of her promotion, with the DRPA rules regarding what constituted reimbursable and non-reimbursable expenses. TT, 4/13/88 at 189, 191; J–II.[4]

10. Despite her awareness of accepted DRPA procedure and policies related to the use of expense accounts, plaintiff, within one week of receiving authorization to use an expense account, falsified receipts and records in an effort to obtain reimbursement for non-reimbursable expenses which she had incurred. TT, 4/13/88 at 203.

11. In February of 1982, Kelly called plaintiff into his office to question her regarding her expense account records for the period from September 1, 1980 through December 31, 1981. TT, 4/14/88 at 118. Kelly, at that time, was the President of the DRPA. TT, 4/13/88 at 152.

12. Kelly asked plaintiff to verify all of the expenses that she had submitted for the aforementioned period. TT, 4/14/88 at 119–120. Plaintiff agreed to do so. This concluded plaintiff's initial meeting with Kelly regarding her expense accounts, which lasted approximately ten minutes. *Id.* at 120.

13. Plaintiff then returned to Kelly within forty-eight hours of the initial meeting, and admitted that she had falsified her expense account records. *Id.;* 4/13/88 at 154; J–II.

14. Thereafter, Kelly and plaintiff drafted a letter dated February 4, 1988, which was addressed to Kelly from Ms. Dadino, in which plaintiff confessed making false statements on her expense account ("February 4 Letter"). J–III; TT, 4/18/88 at 29; TT, 4/13/88 at 154. Attached to the February 4 Letter was a list of specific instances in which plaintiff submitted a falsified voucher for an unjustifia-

---

**3.** Citations to P–__ refer to exhibits which were introduced by plaintiff at trial.

**4.** Citations to J–__ refer to joint exhibits which were introduced into evidence by both parties at trial.

ble expense. J–III. This list was developed during a meeting between plaintiff and Ray Heinzelman, who was at that time the Director of the WTD. 4/13/88 at 163.

15. The method used by plaintiff to falsify or "pad" her expense account was to seek reimbursement for non-reimbursable items by misstating the nature of those items on the records she submitted. For instance, plaintiff, after spending money on something for which DRPA policy did not provide reimbursement, would turn in a voucher wrongly indicating that she had incurred the expense while taking a prospective business client out to lunch. J–III. The costs of such business lunches are reimbursable pursuant to DRPA policy.

16. Some of the expenses which were not properly includible in plaintiff's expense account, but for which she nonetheless sought reimbursement, were (1) the annual renewal fee for her American Express and Diners Club cards; (2) the cost of taking other DRPA personnel out to lunch; (3) the cost of replacing the windshield on her car, which was damaged while plaintiff attended a port harbor festival; and (4) the cost of purchasing a gift for a retired WTD employee who was ill. J–III.

17. Although plaintiff, in the February 4 Letter, confessed that she had lied on her expense account submissions, she maintained that the actual costs for which she sought reimbursement were "reasonable business expenses" which were incurred while she was conducting DRPA business. J–III. Nonetheless, regardless of plaintiff's own judgment as to the propriety of using DRPA funds to pay for the above-listed expenses, it is indisputable that these expenses were not reimbursable pursuant to the policies of the DRPA, and that plaintiff knew this at the time she falsified her records to obtain repayment for these items.

18. Shortly after his meeting with plaintiff, Kelly met with plaintiff's supervisor, Jack Gaffigan, and questioned him regarding the misrepresentations appearing in plaintiff's expense account records. TT, 4/14/88 at 143.

19. At this meeting, Kelly reprimanded Gaffigan for poor supervision of plaintiff, and asked for his resignation. Id. at 144. However, Gaffigan did not tender his resignation at that time. Id.

20. In February of 1982, Kelly presented to the Board of Commissioners of the DRPA a recommendation pertaining to disciplinary action against Loretta Dadino. The recommendation was that plaintiff be suspended for a two-week period and be required to refund to the DRPA all of the money which she had received as reimbursement for unjustifiable expenses. 4/14/88 at 128.

21. This recommendation was rejected by the Board of Commissioners, and the matter was referred to the Audit Committee. TT, 4/14/88 at 132.

22. The DRPA Audit Committee is comprised of four members of the Board of Commissioners. The Committee does not convene regularly, but only when financial problems present themselves. Id. at 133. Rick Robb was the Chairman of the Committee at the time of plaintiff's termination.

23. Though Kelly would normally have the responsibility of disciplining employees, the Board, which has the ultimate authority over personnel, TT, 4/14/88 at 123, expressed a desire to dismiss plaintiff. TT, 4/19/88 at 11.

24. After Kelly's recommendation was turned down by the Board, he was removed from the decision-making process involved in disciplinary actions arising from the expense account investigation. TT, 4/14/88 at 136; TT, 4/18/88 at 54–55.

25. On February 8, 1982, plaintiff again met with Kelly in the latter's office, at which time plaintiff was told that the Board had decided to suspend her indefinitely without pay. TT, 4/13/88 at 156.

26. Thereafter, Edward P. Scullin, the Vice President and Secretary of the DRPA, sent to plaintiff, by certified letter dated March 8, 1982, a copy of charges filed by Kelly, as President of the DRPA, against plaintiff, seeking her discharge ("March 8 Letter"). J–VIIA. This letter informed plaintiff that charges against her would be

heard "at a meeting of the Delaware River Port Authority." *Id.* The letter also notified plaintiff of her right to appear at her disciplinary hearing with legal counsel of her choosing. *Id.*

27. The March 8 letter was sent to plaintiff at the direction of James Kelly. J–VIIB.

28. Plaintiff retained counsel, Charles Nugent, Esquire, who requested that his client be given a hearing before the Board of Commissioners. TT, 4/13/88 at 164. This request was denied in a letter sent to Nugent from John Yeomans, General Counsel to the DRPA. TT, 4/13/88 at 165.

29. Thereafter, a hearing on the charges against plaintiff was held before an independent hearing examiner, The Honorable Edward V. Martino, a retired Superior Court Judge from New Jersey. TT, 4/13/88 at 165. The hearing dates were April 28, 1982 and May 20, 1982.

30. At this hearing, several witnesses testified under oath, including plaintiff, Kelly and Thomas Auchter, the DRPA Treasurer. TT, 4/13/88 at 170. Yeomans was also present at the hearing.

31. During her testimony, plaintiff said that she had been told by her supervisor, Gaffigan, that she should overstate on her expense account the round-trip mileage from the DRPA offices in Camden to a local restaurant named Kenny's. TT, 4/13/88 at 166. According to plaintiff, she was told to do this because Gaffigan had previously overstated the mileage on his expense account, and he wanted both his and plaintiff's records to be consistent. *Id.* at 150.

32. Plaintiff also testified that Gaffigan's long-time secretary, Barbara Cambell Curry, was aware of several instances where Gaffigan had falsified expense account records. According to plaintiff, both she and Curry had been taken out to lunch several times by Gaffigan, who would then seek reimbursement for the cost of these lunches by submitting vouchers which erroneously stated that he had gone to lunch with a prospective business client. *Id.* at 148, 149, and 166.

33. Curry testified at trial, and largely corroborated Dadino's testimony regarding the expense account abuses committed by Gaffigan and others.

34. Curry was never questioned by Kelly, Auchter, Yeomans, or any other employee or commissioner of the DRPA.

35. Plaintiff further testified at her hearing that Arthur F. Diehl, a DRPA operations manager who worked in the Philadelphia Office, had told her that "there was a draw (sic) full of blank receipts if I ever needed them." *Id.* at 166.

36. Following plaintiff's testimony, Gaffigan was called to testify before Judge Martino, but refused on Fifth Amendment grounds. TT, 4/19/88 at 13.

37. The DRPA's lawyers investigated whether they could either compel Gaffigan to testify or discipline him for refusing to do so. TT, 4/19/88 at 13.

38. On June 2, 1982, Judge Martino submitted his findings of fact and a recommendation to the Board of Commissioners suggesting that Dadino be suspended for six months and required to repay the funds which she had misappropriated. J–IX.

39. Judge Martino's recommendation was rejected by the Board, which also voted to terminate plaintiff during a June 16, 1982 meeting. TT, 4/18/88 at 93; J–IX. Upon her termination, plaintiff was required to repay $1,248.00 to the DRPA, which she had admitted misappropriating through the falsification of expense account records.

40. During the same period of time that the foregoing disciplinary actions were proceeding against plaintiff, several other investigative activities commenced into the expense account practices of other DRPA personnel.

41. In January of 1982, Auchter, Vice-President and Treasurer of the DRPA, was directed to conduct an internal audit. Plaintiff Dadino's records initially formed the focus of this audit. TT, 4/12/88 at 106. However, the scope of the investigation was later expanded to include others. *Id.* at 109.

42. Additionally, in March of 1982, the Office of the Attorney General for the State of New Jersey subpoenaed all DRPA employee reimbursement of expense vouchers for the years 1980, 1981 and 1982. D–(C).[5]

43. Finally, at the end of June or beginning of July, 1982, the Audit Committee hired the accounting firm of Touche Ross to conduct an independent audit of the various expense accounts at the DRPA, with particular attention to be paid to those accounts being used in the WTD. TT, 4/18/88 at 96. This audit was to be performed for the two years ended December 31, 1981. J–XA.

44. Touche Ross submitted a Draft Report dated July 29, 1982, P–37, which was received by Auchter, and seen by other persons assisting Auchter in the internal audit. TT, 4/12/88 at 23, 33. Attached to the Draft Report was a four-page document captioned Schedule B. This document, in part, noted that in several instances, male employees had submitted receipts which were issued from the same establishment and which followed a numerical pattern. The dates of these, receipts, however, did not coincide with the numerical patterns that were evident. Some higher-numbered receipts were dated earlier than some lower-numbered ones, and several consecutively-numbered receipts bore dates that were months apart. P–37.

45. For example, Schedule B showed that Diehl had submitted the following consecutively-numbered receipts from Neil's Restaurant for the following dates:

| 7344 | 2/12/80 |
| 7345 | 3/25/80 |
| 7346 | 11/06/80 |
| 7347 | 2/10/81 |
| 7348 | 3/16/81 |

*Id.*

46. Schedule B also indicates that William Brawley, a manager in the New York City office, submitted receipts which were numbered and dated as follows:

| 42515 | 5–11–81 |
| 42519 | 3–24–81 |
| 42538 | 4–23–81 |
| 42539 | 6–01–81 |
| 42545 | 12–09–80 |
| 42546 | 12–30–80 |
| 53985 | 8–11–81 |
| 53988 | 8–26–81 |
| 58462 | 10–10–81 |
| 58463 | 7–14–81 |

*Id.*

47. The same types of numerical patterns were recognized for, *inter alia*, Richard Craddock, a manager in the DRPA's Chicago office, and Carlo Fortuna, a Maintenance Department employee in New Jersey. *Id.*

48. Furthermore, Schedule B stated that Diehl had submitted many receipts for expenses incurred at Spats Restaurant in Philadelphia, which were not accompanied by explanations of how the expenses were incurred. *Id.* Similarly, Touche Ross reported that the DRPA had paid amounts which were listed in monthly invoices from Spats directly to the restaurant, without receiving a corresponding explanation of the business purposes of the disbursements. *Id.*

49. The information contained in Schedule B, as well as in the rest of the Touche Ross Draft Report, was communicated to Robb, the Chairman of the Audit Committee, during numerous conversations between Robb and a Touche Ross partner. TT, 4/18/88 at 100.

50. Touche Ross also submitted a Final Report to the Audit Committee which differed from the Draft Report in two major respects. First, the Final Report did not contain Schedule B or any reference thereto. Second, the Final Report contained a section not appearing within the Draft, which noted that certain improved procedures for the documentation of travel and entertainment expenses had been implemented by the DRPA. J–XA; TT, 4/12/88 at 26.

51. It remains unclear, following the testimony at trial, how it happened that the obviously important information contained in Schedule B of the Draft Report was excised from the Touche Ross Final Report. It is also uncertain why the Audit

---

**5.** Citations to D–(____) refer to exhibits which were introducted by defendant at trial.

Committee, which authorized the payment to Touche Ross of $12,000.00 in DRPA monies for the Final Report, and which apparently was aware of the information contained in Schedule B, did not insist that the Schedule B information be included in the Final Report.

52. The internal audit conducted by Auchter found that Carlo Fortuna had submitted falsified receipts. Auchter concluded that Fortuna had incurred meal expenses while working in the field for the DRPA, but had not obtained receipts upon paying for each meal. These expenses individually did not exceed $25.00, and were properly reimbursable, pursuant to DRPA policy. Furthermore, DRPA policy did not require that receipts be submitted for expenses under $25.00. Auchter also concluded that Fortuna was under the mistaken belief that he was required to submit receipts to obtain reimbursement for these meals, which led Fortuna to submit the false receipts which were detected by Touche Ross. TT, 4/12/88 at 130–135.

53. Auchter's audit also corroborated the existence of the irregularly-numbered receipts which had been submitted by Diehl, Brawley and Craddock. TT, 4/12/88 at 30, 31. Additionally, the internal audit uncovered the fact that Diehl and Brawley had submitted vouchers indicating that the same man had been taken out to dinner by each of them in different cities on the same day. *Id.* at 50. P–27.

54. Auchter also learned through the internal audit that Diehl submitted a receipt numbered 15434 to document a business lunch in the Philadelphia area, and that Brawley, five months earlier, had submitted a similar receipt numbered 15433 to justify a lunch expense incurred in New York City. TT, 4/12/88 at 50. Auchter agreed, during his trial testimony, that both of these receipts could not be valid. *Id.* at 51. Auchter also testified that some of the receipts submitted by Diehl and Brawley were undated. *Id.* at 49.

55. In conducting his internal audit, Auchter examined each of the entries made by Dadino on her expense account. *Id.* at 16. However, in reviewing the expense accounts of Diehl and Brawley, Auchter only analyzed a test sample of the entries made by those two men. *Id.* at 17.

56. Auchter gave two explanations for treating the review of the Diehl and Brawley accounts differently than that of plaintiff's accounts. First, plaintiff had admitted that she had falsified some of her vouchers prior to the audit, while Diehl and Brawley had consistently denied any wrongdoing. "Therefore, audit procedures, if you find a mistake in an audit procedure or errors, you expand your audit to see if there are any others. In her [plaintiff's] case, when she admitted some of her entries were false, I felt it was good audit procedure to look at all of her entries." *Id.* at 17 (Auchter testifying).

57. Second, Auchter explained that a review of each one of the entries made by Diehl and Brawley would have been a much more time-consuming process than a like review of plaintiff's records. Both Diehl and Brawley submitted a substantial number of vouchers. *Id.* For instance, Auchter estimated that the total amount of dollars that Brawley had been paid in reimbursement for 1981 was from eighteen to twenty thousand dollars, *id.* at 20, whereas Dadino had received a total of about five thousand dollars. *Id.* at 74.

58. The court finds these explanations, both from an accounting and a common sense perspective, to be nonsensical at best and disingenuous at worst. Applying the accounting principle which purportedly led Auchter to examine each of plaintiff's vouchers, the scope of the audit of Diehl's and Brawley's vouchers should have been expanded once the consecutive receipts and other irregularities in their expense account records were discovered. Furthermore, while it is obviously true that an entry-by-entry review of the voluminous records of Diehl and Brawley would have required a lot of work, it is also true that the size of their expense accounts gave these men a better opportunity than plaintiff to steal. Therefore, one would think that Auchter's paramount concern, as Treasurer, would have been to detect and prevent expense account fraud by those with

the greatest access to the public funds of the DRPA.

59. A written report of the findings of the internal audit was not routinely submitted to the Audit Committee. Instead, Auchter would make oral reports to the Committee. TT, 4/12/88 at 37, 53.

60. Neither the Touche Ross report nor the internal audit conducted by Auchter uncovered any irregular or questionable items listed in the expense accounts of Jack Gaffigan. J–XB; TT, 4/12/88 at 123–126; TT, 4/19/88 at 14.

61. In March or April of 1982, Diehl and Brawley were called in separately to Kelly's office to explain the discrepencies in their expense accounts. TT, 4/19/88 at 14–15; TT, 4/12/88 at 45–46. Present at each of these meeting were Auchter, Kelly and Yeomans. *Id.* Auchter also testified that it was very possible that Heinzleman was present. *Id.*

62. During these meetings, both Diehl and Brawley offered the explanation that they had collected a great number of receipts during the course of their work, and that sometimes they would lose track of the chronological order in which their expenses were incurred. Accordingly, the men stated that they would date and submit the receipts as accurately as they could, but that occasionally a receipt would be listed out of place. *Id.* at 47–49.

63. Auchter testified that he did not believe that these statements by Diehl and Brawley adequately explained their submission of consecutively-numbered receipts to justify meal expenses over an extended period of time. *Id.* However, the fact that these explanations were unacceptable did not, according to Auchter's testimony, lead him to conclude that the expense accounts of Diehl and Brawley were "absolutely fraudulent," *id.* at 48, nor did he consider it reason enough to do a complete audit of the men's vouchers, as had been done with plaintiff. *Id.*

64. Brawley also offered as an explanation that he had obtained most of the sequentially-numbered receipts from Harry's Restaurant in New York City. *Id.* at 54. Auchter subsequently checked on the valid-ity of this statement by sending a DRPA employee named Orville Parker to Harry's to obtain a copy of the restaurant's actual receipt. Upon examining this receipt retrieved by Parker, it became apparent to Auchter that it was different from those sequentially-numbered receipts which Brawley had said had come from Harry's. *Id.* at 55.

65. Auchter testified that during the meeting with Diehl, Diehl explained that the Spats receipts which were apparently undocumented on his voucher forms actually had penciled explanations of how the expenses were incurred on the backs of the receipts. *Id.* at 59. According to Auchter's testimony, when he received the Spats receipts during the 1982 audit, they were taped down on all four sides to a blank piece of paper. TT, 4/12/88 at 61. Auchter stated that he did not know whether the receipts had originally been submitted in this fashion, or whether one of his auditors had taped them to the paper. *Id.* at 68. Auchter also stated that, while this method of justifying expenditures was unusual, he accepted Diehl's explanation, and considered the Spats receipts to be legitimate. *Id.* at 69.

66. Patricia Alburger worked as the secretary for the Philadelphia Field Office of the DRPA for seven and one half years, before being promoted to the position of coordinator of Industrial Marketing and Development two years prior to the date of trial. TT, 4/13/88 at 105. While a secretary in Philadelphia, she worked for, among others, Arthur Diehl. *Id.* One of her tasks was typing and compiling Mr. Diehl's expense account records. *Id.* at 106.

67. Alburger testified at trial that, during her years as a secretary, she recalled receiving from Diehl receipts from Spats with penciled expanations written on the back of them. *Id.* at 114.

68. Alburger also testified that she recalled some instances in which she would tape the receipts on all sides to a blank piece of paper before submitting them for reimbursement. *Id.* at 125. This testimo-

ny, however, is seemingly inconsistent with an earlier deposition of Alburger, during which she stated that it had been her practice, when submitting receipts of Diehl's which had information on the back of them, to follow one of three procedures:

(1) tape the receipt on one side to a blank sheet of paper, so that the receipt could be flipped over and the back could be read;

(2) type the explanation which appeared on the back of the receipt into the voucher form; or

(3) type the explanation at the top of the page. *Id.* at 124.

69. The evidence adduced at trial is inconclusive on the issues of who wrote the penciled information on the Spats receipts or when that information was written. It is clear, however, that this method of justifying expenses is contrary to DRPA policy. TT, 4/12/88 at 69.

70. At no time during the internal audit did Auchter, or any other DRPA official or employee, question Alburger regarding Diehl's submission of the Spats receipts. *Id.* at 128.

71. On the basis of his audit, Auchter concluded that Diehl and Brawley had each submitted approximately $500 to $1,000 worth of "questionable" receipts. TT, 4/12/88 at 70.

72. By letter dated September 8, 1982, addressed to Richard B. Craddock from Kelly, the DRPA advised Craddock that the Audit Committee had directed that he be terminated. J–XI. The Audit Committee made this determination based on the evidence in the Touche Ross Draft Report of expense account abuses on the part of Craddock. 4/18/88 at 105.

73. Craddock was "a month to month employee" who did not have an employment contract which provided for a hearing before termination. Accordingly, no such hearing was held. *Id.;* TT, 4/14/88 at 139.

74. Diehl and Brawley did have employment contracts which provided for a pre-termination hearing. P–41; P–42. A similar employment contract was held by plaintiff.

75. On September 15, 1982, an Audit Committee meeting was convened. The purpose of this meeting, as described in the minutes of a Board of Commissioner's meeting which was held the same day, P–19, was two-fold:

(1) "[t]o provide Mr. Gaffigan, ..., an opportunity to appear before the Audit Committee and to respond to certain charges and allegations that are part of the TRANSCRIPT prepared in the Matter of LORETTA DADINO"; and

(2) "to receive a Report presented by Mr. Auchter, Vice President and Treasurer, concerning the staff committee's continuing review and evaluation of the expense account records of employees of the Delaware River Port Authority." P–19.

76. At the conclusion of the September 15, 1982 Audit Committee meeting, the Committee decided to make the following report and recommendation to the full Board.

76. First, while the Committee found Gaffigan's expense vouchers "well documented and in proper order," it considered his "performance as the Supervisor of Ms. Dadino ... to be inadequate." Accordingly, the Committee recommended that Gaffigan "be issued a strong reprimand in letter form for what it considered inadequate performance of managerial duties and responsibilities." *Id.*

78. Second, the Committee found that "the expense account vouchers submitted by Mr. Diehl, ..., and Mr. Brawley, ..., contained significant irregularities and that they were not in accordance with the established practice and regulations of DRPA." Accordingly, the Committee "recommended that charges be preferred against Mr. Diehl and Mr. Brawley and that appropriate hearings be conducted in accordance with the terms of their Employment Contracts." P–19.

79. The minutes of the September 15, 1982 Board of Commissioners meeting reflect that the Board adopted the Audit Committee's Recommendations. P–19.

80. By letter dated October 26, 1982, addressed to Gaffigan from William J.

Doyle, Chairman of the DRPA, Gaffigan was issued a reprimand, informing him that his supervision of plaintiff had been inadequate, and that he had been relieved of his duties as Assistant Director of Marketing Services and reassigned to the position of Manager, Industrial and Export Development. J–XVI.

81. Gaffigan resigned shortly after receiving this reprimand.

82. By letters dated October 20, 1982, addressed to Diehl and Brawley from Scullin, Diehl and Brawley were notified of charges filed against them by President Kelly, seeking their discharge from employment with the DRPA. J–XIVA; J–XVA. These letters were sent per the instructions of Kelly, J–XIVB; J–XVB, who was acting in accordance with the direction of the Audit Committee and Board of Commissioners. *Id.;* P–19.

83. These letters informed Brawley and Diehl that the charges against them would be heard "by the Delaware River Port Authority," and notified the men of their right to appear at their disciplinary hearing with legal counsel of their choosing. *Id.*

84. After receiving the October 20, 1982 letters, Diehl and Brawley hired attorneys. The attorneys appeared at the disciplinary hearings for these men, and "made it very clear that their clients had not falsified any expense account vouchers ... and ... advised their clients not to cooperate with [the] investigation or to appear before the Audit Committee." TT, 4/18/88 at 108 (Robb testifying).

85. Upon learning that Diehl and Brawley would not testify or cooperate, Chairman Robb decided to refer the matter to the then District Attorney for Philadelphia, Edward Rendell. *Id.* at 109. Robb met with Rendell, who advised him that jurisdiction over the matter in question would more properly rest with the Attorney General for the State of New Jersey. *Id.*

86. Thereafter, Robb instructed the DRPA's attorney, Hersh Koslov, to refer the matter to the New Jersey Attorney General. *Id.* at 109. As noted earlier, See ¶ 42 *supra,* the Attorney General had already subpoenaed expense account records from the DRPA.

87. After referring the matter to the Attorney General, Robb and the Audit Committee determined that the DRPA would not proceed further against Diehl and Brawley to achieve their termination until such time as the Attorney General reported his findings. *Id.* at 112.

88. Robb, during his trial testimony, gave the following explanation why he and the Audit Committee chose to refer the cases of Diehl and Brawley to the Attorney General, in lieu of pursuing further administrative action against these men:

My feeling at this point was that if you didn't get cooperation, you, with the powers that we had, which were voluntary, you weren't going to get to the bottom of it.

My view was, as I have stated twice before, public monies were misappropriated here and they were law enforcement authorities in New Jersey. They had the powers to enforce the law.

I'm (sic) my view at that point was to, you know, that's what you have an attorney general for, and let him get into it and let the chips fall where they may. TT, 4/18/88 at 110.

89. Robb also testified that, in his mind, Diehl and Brawley had done exactly the same thing that plaintiff had done, but that since she had admitted her offense and the men did not, the DRPA was not capable of taking the same action against them as it had against Dadino. *Id.* at 116–118.

90. It was the initial position of Robb and the Audit Committee that anyone who was found to have committed violations of the DRPA's expense account policies should be terminated. *Id.* at 104, 115.

91. State Investigator Leon Wojna of the New Jersey Attorney General's Office, submitted a memorandum report dated May 25, 1982, to George H. Henningsen, Chief of the Special Prosecutions Section of the Division of Criminal Justice ("Wojna Report"). D–(P).

92. In his report, Investigator Wojna presented the results of a sample analysis

which he had conducted of the expense account vouchers of eight DRPA employees, all of whom were men. By calling some of the individuals which each man had listed as a companion during a purportedly reimbursable business luncheon, Investigator Wojna determined whether any discrepencies existed. *Id.*

93. Wojna's analysis reflected that four of the eight investigated employees had submitted vouchers containing misstated information. These men were Jerome Sheehan, Operations Manager in the Philadelphia Office, James A. Cooper, Managing Director of the New York City Office, William Brawley and Arthur F. Diehl. Additionally, the report stated that an investigation of receipts submitted by Gaffigan for the period January 1, 1981 to December 31, 1981 uncovered no discrepencies. *Id.*

94. Out of fifty-one lunch entries listed by Sheehan for the period January 1, 1981 to January 1, 1982, Wojna called thirty-six of the individuals with whom Sheehan claimed to have lunch. Fifteen of these persons

> stated that Sheehan had never bought lunch for them on the dates listed on the vouchers Sheehan had submitted for reimbursement; (2) firms, also listed on the attached schedule, indicated that they had no record of the employee Sheehan had listed on his vouchers.

*Id.*

95. The results of Wojna's investigation indicate that Sheehan received $279.35 in reimbursement funds to which he was not entitled.[6]

96. Out of thirty-one lunch entries listed by Cooper for the period May 18, 1981 to December 28, 1981, Wojna called twenty-six of the individuals with whom Cooper claimed to have lunch. Three of these individuals "stated that Cooper had never bought lunch for them on the dates listed on the vouchers Cooper submitted for reimbursement." *Id.*

97. The Wojna Report indicates that Cooper received $100.58 in reimbursement funds to which he was not entitled. *Id.*

98. Out of thirty lunches listed by Brawley for the period June 1, 1981 to December 31, 1981, Wojna called fifteen of the individuals with whom Brawley claimed to have lunch. Two of these individuals "stated that Brawley never bought lunch for them on the date listed on the voucher Brawley had submitted for reimbursement." *Id.*

99. The Wojna Report indicates that Brawley received $58.90 in reimbursement funds to which he was not entitled. *Id.*

100. Out of the fifty lunches listed by Diehl, Wojna called twenty of the persons with whom Diehl claimed to have lunch. One of these individuals "stated that Diehl never bought lunch for him on the date listed on the voucher Diehl submitted for reimbursement." *Id.* The cost of this lunch was listed as $28.75.

101. By memorandum dated June 17, 1982, Chief Henningsen suggested to The Honorable Joel B. Rosen, then Deputy Chief of the Special Prosecution Section, and currently a federal magistrate for the District of New Jersey, that a copy of the Wojna Report be provided to Hersh Koslov, New Jersey counsel for the DRPA. D-(P); TT, 4/12/88 at 159.

102. On June 18, 1982, Judge Rosen wrote a note to Henningsen, using the same piece of paper on which Henningsen's June 17 memorandum was printed, stating that "Koslov has asked to come in to review file. I will make arrangements. Joel. 6-18-82." *Id.*

103. While Henningsen authorized Judge Rosen to meet with Koslov, he does

---

6. In his report, Investigator Wojna subtracted what he approximated to be the portion of the inaccurate entries that Sheehan had paid for his own lunch. This apparently was done pursuant to the mistaken belief that DRPA policy entitled Sheehan to be reimbursed for his own lunches even when not accompanied by a prospective business client. As noted earlier, Sheehan and the other managers were not entitled to reimbursement for any lunch expense unless it was incurred in the company of a client. *See* ¶ 15 *supra.* Accordingly, this court reads the Wojna Report as reflecting misappropriation by Sheehan and the others in the total amount of lunch expenses for which falsified vouchers were submitted.

not know whether such a meeting ever took place. TT, 4/12/88 at 160.

104. On November 4, 1982, Thomas J. Kiselica, a State Investigator for the Special Prosecution Section, wrote a memorandum regarding the DRPA investigation ("Kiselica Memo"). D–(P). This memorandum recapitulated the findings of the Wojna Report, and concluded:

Based on all the investigative and audit information obtained to date, it does not appear that Dadino's allegations of widespread fraud are true. The irregularities uncovered over the two year period examined have been relatively few in number and small in dollar value.

*Id.*

105. The Kiselica Memo also recommended that a criminal prosecution in the DRPA matter not be pursued. *Id.* The reasons given in support of this recommendation were: (1) the relatively small dollar amounts involved; (2) the reluctance of witnesses, who are themselves salesmen or business men with expense account privileges, to cooperate in such a prosecution; and (3) the decrease in the available proof and the accuracy of witness accounts in the two years since some of the expenses in question had been incurred. *Id.*

106. On November 8, 1982, Judge Rosen sent Henningsen a memorandum which stated his concurrence with Kiselica's conclusion "that administrative action is a most appropriate means of resolving this matter" ("Rosen Memo"). *Id.*

107. Henningsen then forwarded the Rosen Memo to First Assistant Attorney General Thomas Greelish, advising Greelish that Henningsen agreed with Judge Rosen's recommendation, and asking Greelish how he wished to proceed. *Id.;* TT, 4/12 88 at 166.

108. Greelish then returned the Rosen Memo to Kiselica, indicating his approval of the decision not to pursue a criminal prosecution in the DRPA matter. D–(P); TT, 4/12/88 at 166.

109. On January 10, 1983, the Audit Committee held a meeting, the subject of which was personnel action concerning Diehl and Brawley. D–(J). The minutes of this meeting, *id.,* state that present at the meeting were, *inter alia,* David Creskoff, Esquire, from the office of D. Donald Jamieson, DRPA's Pennsylvania counsel, and Koslov. *Id.*

110. According to the minutes, Creskoff presented the following review of the Diehl matter to the Committee:

Mr. Creskoff advised the Committee that he and Mr. Kozlov, who is handling the Brawley Matter, had met with the Mr. Jamieson and Mr. Yeomans and other members of the staff to review the charges and the evidence available. Such evidence consisted of various vouchers, some of which were false. He advised that the false vouchers, of course, would be entered into evidence, however, testimony was also needed to establish the invalidity of such vouchers. He further advised that the problem in both matters was that those named on the vouchers as having received free meals, did not wish to testify in any of the DRPA hearings and that DRPA did not have subpoena power. He stated that he and Mr. Kozlov had met with the Deputy Attorney General and members of the Attorney's staff handling the Grand Jury investigation, and that they had indicated a willingness to cooperate. The Attorney General handling the matter also indicated that their investigation indicated that other persons would likely have to be brought into the matter if it proceeded to presentment to the Grand Jury.

*Id.*

111. The minutes of the January 10, 1983 meeting also indicate that Koslov spoke to the Committee, telling it "that he had received two letters from a Mr. Weinstein, the attorney for Mr. Brawley, which indicated that Messrs. Brawley and Diehl might be willing to enter into some sort of plea bargaining arrangement which would lead to discipline other than discharge." *Id.*

112. A discussion of the plea bargain concept followed, during which the majority of the Committee members expressed a

desire "to get to the bottom of the allegations concerning misuse of expense accounts rather than have any appearance of a limitation of the investigation." *Id.* Thereafter, the Committee resolved that "the Attorney General be requested to proceed with the investigation and bring the matter before the Grand Jury, and that Messrs. Creskoff and Koslov meet with counsel for Messrs. Brawley and Diehl, and so advise them and to advise the Committee of the response of the counsel for Messrs. Brawley and Diehl prior to the Board Meeting on January 19, 1983." *Id.*

113. On February 7, 1983, the Audit Committee met again, at which time Chairman Robb reviewed the matter involving the expense accounts of Dadino, Diehl and Brawley. According to the minutes, Robb pointed out that plaintiff "had been suspended pending her Hearing on the basis that she admitted her guilt, whereas Messrs. Diehl and Brawley have not been suspended and continue to work in view of the fact that they contend that they have not participated in any wrongdoing." *Id.* D–(K). The minutes also indicate that Robb stated the following:

> Commissioner Robb stated that the Committee, in recommending that charges be preferred against Messrs. Diehl and Brawley as well as Ms. Dadino, had wanted full information concerning the situation as it existed. This was found to be impossible because of the lack of cooperation by the third parties and by the fact that the Authority lacked subpoena power. The attorneys representing the Authority had contacted the Attorney General of New Jersey who in turn had placed an Investigator on the matter who discovered that there were possibly others involved. Commissioner Robb also pointed out that one of the attorneys, representing one of the parties charged, had approached the Authority's attorneys concerning a possible plea-bargain arrangement. It was Commissioner Robb's position that the Authority should not become involved in such a matter, and that the Attorney

General of New Jersey should handle the investigation.

*Id.*

114. During the pendency of the Attorney General's investigation, a private investigator, Alan Hart, was retained by Hersh Koslov to look into the expense accounts of Diehl and Brawley. Hart filed the report of his investigation on July 14, 1983 ("Hart Report"). J–XIX.

115. According to the Hart report, Hart met with Kiselica in December of 1982, and received the information contained in the Wojna report pertaining to Diehl and Brawley. *Id.* Hart then conducted his own telephonic investigation of the vouchers submitted by Diehl and Brawley. The Hart Report indicated that of those persons whom Hart was able to contact, not one could positively state that he or she had not had lunch with either Diehl or Brawley on an alleged luncheon date. Furthermore, several persons definitely confirmed that they had met Diehl or Brawley for lunch on the specific date in question. *Id.*

116. On July 23, 1983, the Audit Committee held another meeting, at which Chairman Robb reviewed the matter of the Diehl, Brawley and Dadino expense accounts. J–XX. According to the minutes of this meeting, "Robb pointed out that Loretta Dadino had been suspended pending her hearing on the basis that she had admitted her guilt, whereas Messrs. Diehl and Brawley have not been suspended and continue to be employed in view of the fact that they contend that they have not participated in any wrongdoing." *Id.* Robb also recounted the hiring of Touche Ross and the eventual decision to refer the case to the Attorney General, in light of the DRPA's "limited investigative resources and lack of subpoena powers." *Id.*

117. Koslov also spoke at the July 23, 1983 Audit Committee meeting. *Id.* According to the minutes thereof, Koslov summarized the Attorney General's findings pertaining to Diehl and Brawley, *id.*, and told the Committee that he had been informed by the Attorney General that Diehl and Brawley would not be prosecuted. *Id.* Koslov also reiterated the ne-

cessity of referring the Diehl and Brawley matters to the Attorney General, since "the DRPA did not have subpoena power and could not produce witnesses for any administrative hearing that might be conducted." *Id.*

118. Koslov also raised again the question of a plea bargain arrangement between the DRPA and Diehl and Brawley. *Id.* Koslov stated that counsel for these men had indicated that their clients would accept "a three week suspension without pay with no other adverse impact upon their employment standing with the DRPA." *Id.*

119. Following discussion of the ramifications of entering into "plea-bargain" talks with Diehl and Brawley, the Committee approved a motion that Koslov "meet with Messrs. Brawley's and Diehl's attorneys to negotiate the terms of a three weeks' suspension without pay and such other terms as may be appropriate to insure the interests of the DRPA and the two employees." *Id.*

120. Robb expressed the view that, while he was displeased with this outcome, "he realized that such a settlement with these two employees was the best that could realistically be achieved." *Id.*

121. On September 12, 1983 the Audit Committee convened a meeting, at which Commissioner Robb recommended that the plea bargain with Diehl and Brawley, as negotiated by Koslov and Creskoff, be recommended to the full Board of Commissioners. J–XXI. The bargain entailed a twenty-one calendar-day suspension without pay. This recommendation was approved by the Committee. *Id.*

122. On September 20, 1983, Judge Rosen sent a letter to Hersh Koslov, formally notifying him that the Attorney General, as a result of his investigation, had decided not to prosecute any DRPA employees for expense account fraud. J–XXIII. In his letter, Rosen stated:

> As you are aware, our investigation confirmed that several employees did submit fraudulent expense vouchers. However, it is clear that the total amount of fraud was relatively small considering the number of employees involved and the two-year time period examined. Additionally, it is clear that no organized pattern of corruption existed. It is our conclusion that, when balanced against the substantial time and expense involved in preparing and prosecuting these individual cases (including for example the subpoenaing of a number of out-of-state witnesses), as well as the significant trial problems inherent in several of the cases, the administrative disposition of these matters is clearly appropriate.

123. On September 21, 1983, the Board of Commissioners of the DRPA held a meeting, at which the Board adopted the recommendation of the Audit Committee that Brawley and Diehl be suspended for twenty-one calendar days without pay. J–XXIV. During this meeting, Commissioner Ross expressed his disagreement with the Audit Committee's recommendation, and his view that stronger action should be taken against Diehl and Brawley. *Id.* As part of this administrative action, the DRPA gave Diehl and Brawley retroactive pay raises effective November 1, 1982. These raises had been withheld, pending the outcome of the investigation into Diehl and Brawley. J–XXIV.

124. Upon returning from his suspension, Brawley was promoted to a position which gave him the responsibility for reviewing and approving expense account vouchers for other employees. TT, 4/18/88 at 151.

125. Diehl and Brawley were never required to repay the money which they were suspected of stealing from the DRPA. TT, 4/18/88 at 71–72.

126. In January of 1985, following the institution of this lawsuit, Hersh Koslov wrote to Donald Belsole, Director of the Division of Criminal Justice of the New Jersey Attorney General's Office, requesting that he be provided with "such documents as were conducted or generated" during the Attorney General's investigation of the DRPA. D–(O).

127. In March of 1985, Koslov called George Henningsen, and again requested

**346**

the aforementioned documents. TT, 4/12/88 at 168; D–(P). In response to his requests, Koslov received a packet containing, *inter alia*, the Wojna Report and the Kiselica Memo.

128. While plaintiff alleges that the information contained in the Wojna Report concerning Sheehan and Cooper was communicated to the Board of Commissioners in 1983, the court finds insufficient evidence in the record to establish that this information was made known to the DRPA prior to March of 1985. While plaintiff cites the testimony of Kelly, Yeomans and Auchter on this point, the testimony of these men was at best inconclusive as to when they first received information regarding Sheehan and Cooper, and when, if ever, they communicated this information to the Commissioners. *See* TT, 4/18/88 at 38, 79 (Testimony of Kelly); TT, 4/19/88 at 97–100 (Testimony of Yeomans); TT, 4/13/88 at 47–49.

129. The DRPA never took any action against Sheehan or Cooper after receiving the Wojna Report in 1985.

III. CONCLUSIONS OF LAW

■ It is obvious in the present case that the DRPA had a good reason for firing Loretta Dadino, namely the admitted falsification of her expense account records. This fact alone, however, does not bar plaintiff's recovery under Title VII. This was made clear by the Supreme Court in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). In *McDonald*, the court held that white employees who were dismissed from their employment after being charged with misappropriating property from their employer could state a claim under Title VII by asserting that a black employee, similarly charged, was not dismissed. *id.* at 283, 96 S.Ct. at 2580. In so holding, the Court stated:

> While Santa Fe may decide that participation in a theft of cargo may render an employee unqualified for employment, this criterion mut be 'applied alike to all members of all races,' and Title VII is violated if, ..., it was not.... The Act

prohibits *all* racial discrimination in employment, without exception for any group of particular employees, and while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination.

*Id.*

The force of this reasoning applies equally to plaintiff's averments of employment discrimination on the basis of sex. Therefore, despite plaintiff's malfeasance, defendant's failure to fire those male managers purportedly guilty of similar transgressions gives rise to a valid cause of action under Title VII.

That having been said, plaintiff must still establish by a preponderance of the evidence, that defendant intentionally discriminated against her, in order to succeed on her Title VII desparate treatment claim. *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Gunby v. Pennsylvania Electric Company*, 840 F.2d 1108, 1115 (3d Cir. 1988). Consequently, plaintiff must show that the reasons given by defendant for not firing those male managers suspected of the same expense account abuses for which plaintiff was discharged are pretextual, "i.e. ... merely ... fabricated justification[s] for discriminatory conduct." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir.1987) (en banc). *See also Gunby*, 840 F.2d at 1115; *Bellissimo v. Westinghouse Electric Corp.*, 764 F.2d 175, 179 (3d Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986).

Plaintiff may meet this burden "either directly by persuading the court that a discriminatory reasons more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Moreover, plaintiff must also show that she would not have been fired, but for the fact that she is a woman. *Gunby*, 840 F.2d at 1115; *Lewis v. University of Pittsburgh*, 725 F.2d 910,

915 (3d Cir.1983), *citing McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

In support of her claim, plaintiff points to defendant's treatment of her as compared to that of five male managers—Gaffigan, Diehl, Brawley, Sheehan and Cooper—who were also purportedly guilty of expense account abuse. Plaintiff contends that the men were dealt with more favorably than she, and to substantiate this assertion, plaintiff emphasizes the inadequacy of the DRPA's investigation of these men, and the ineffectiveness of the steps taken by defendant, if any, to achieve their termination.

I must concur wholeheartedly with plaintiff that the DRPA's actions in this matter left much to be desired. Indeed, if this were a lawsuit alleging incompetence and neglect on the part of defendant, this court may well have been compelled to direct a verdict for plaintiff at the close of her case. I found some of the testimony in this matter to be truly shocking, indicative of public servants who approach their duties with blinders on. DRPA officers, during the course of the trial, were repeatedly heard to mouth such refrains as "That was not my job" or "I had no authority over that area." The result of this apparently pervasive attitude was a half-hearted investigation, which left many stones unturned and many questions unasked and unanswered.

Nonetheless, the ineptitude and lethargy displayed by the DRPA in its efforts to curb the missappropriation of the public's money through the padding of expense accounts is not the issue before me. The presence or absence of intentional discrimination is.

The ultimate issue of discriminatory intent in a Title VII case is a question of fact. *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482. Accordingly, having deduced the factual events and circumstances surrounding the termination of plaintiff, and having set out the applicable legal framework in which these facts are to be viewed, the court must proceed to examine the evidence of disparate treatment and the proffered rea-

sons therefor, in order to "decide which party's explanation of the employer's motivation it believes." *Id.* at 716, 103 S.Ct. at 1482.

## IV. THE ULTIMATE ISSUE OF FACT

### A. *Dadino v. Gaffigan*

■ Plaintiff argues that defendant knew that Gaffigan had submitted false, incomplete or inaccurate expense account records. Therefore, plaintiff claims that Gaffigan was treated more favorably than she, in that the DRPA:

(1) did not make Gaffigan answer charges at a hearing under oath and subject to cross-examination, but rather allowed him to appear before the Commissioners to explain himself;

(2) did not seek information from Ms. Dadino or Barbara Curry regarding their knowledge of Gaffigan's expense account practices;

(3) did not make Gaffigan repay any of the monies he misappropriated; and

(4) did not punish Gaffigan at all.

The court must disagree with plaintiff's initial conclusion that the Board of Commissioners was aware of expense account abuses on the part of Gaffigan. Neither the Touche Ross report nor the internal audit conducted by Auchter uncovered any irregular or questionable items listed in Gaffigan's expense account records. ¶ 60.[7] Therefore, the fact that Gaffigan was treated differently from plaintiff does not give rise to an inference of discrimination against her. The Commissioners knew that she had stolen, but had no hard evidence that Gaffigan had done so. Consequently, the DRPA had a legitimate reason for not demanding any repayment from Gaffigan, or for not seeking his discharge in a disciplinary hearing.

As alluded to earlier, the most disturbing fact about Gaffigan, and indeed all of the men suspected of expense account padding, is the ineffectual investigation conducted by the DRPA. During Ms. Dadino's hear-

---

**7.** Citations to ¶ __ refer to the numbered para-  graphs appearing in section II of this opinion.

ing, at which Messrs. Auchter, Kelly and Yeomans were present, plaintiff testified that Gaffigan had committed several expense account violations of which she and Ms. Curry, Gaffigan's secretary, had personal knowledge. ¶¶ 31, 32. Ms. Dadino also testified that Gaffigan had encouraged her to pad her own account. ¶ 31. However, Auchter, the Treasurer of the DRPA, Kelly, the President of the DRPA, and Yeomans, DRPA General Counsel, never sought to question Ms. Curry as to her knowledge of Gaffigan's expense account.

It is true that efforts were made to obtain Gaffigan's testimony at plaintiff's hearing, but he refused to cooperate, citing his right against self-incrimination. ¶ 36. Furthermore, at the time of Gaffigan's refusal, DRPA lawyers did research the issue of whether Gaffigan could be compelled to testify or be disciplined for refusing to do so. ¶ 37. It is also understandable why Auchter, Kelly and Yeomans might not have believed Dadino's accusations of Gaffigan, given the nature of the charges against her and her obvious motive to place blame on her supervisor for her own misdeeds. But one would expect that a competent investigation into expense account fraud at the DRPA would have explored Dadino's testimony, at least to the extent of questioning Curry.

Notwithstanding the inadequacy of the probe into Gaffigan's accounts [8], the fact remains that the Board of Commissioners at no time had before it clear evidence of expense account padding by Gaffigan. Indeed, when Gaffigan was called before the Board, it was not to explain discrepencies in his expenses, but rather to be questioned regarding his supervision of plaintiff. ¶ 75. Additionally, I find plaintiff's conclusion that Gaffigan received no punishment to be contrary to the record, which indicates that Gaffigan received a letter of reprimand and a demotion. ¶ 80.

### B. *Dadino v. Sheehan and Cooper*

■ As was stated at ¶ 128, the court finds that plaintiff failed to establish that

the Commissioners received the information about Sheehan and Cooper which was contained in the Wojna Report any earlier than 1985, after the commencement of this lawsuit. Accordingly, the DRPA's failure to pursue disciplinary action against these men upon receipt of the Wojna Report does not give rise to the inference that discriminatory motives led to plaintiff's termination in 1982.

### C. *Dadino v. Diehl and Brawley*

As for Diehl and Brawley, plaintiff argues that defendant knew that these men had admitted false, incomplete or inaccurate expense account records. She therefore alleges disparate treatment based on the following:

(1) she was suspended immediately upon the discovery of evidence of wrongdoing, whereas the men were not;

(2) she was terminated, whereas Diehl and Brawley were offered plea bargains and were given three week suspensions with retroactive pay raises;

(3) each one of plaintiff's expense account items was checked during the internal audit, whereas Auchter only did a sample analysis of the men's accounts; and

(4) Diehl and Brawley, unlike plaintiff, were not required to repay the money which they were suspected of stealing from the DRPA.

I agree with plaintiff that the Board of Commissioners knew that Diehl and Brawley had padded their expense accounts. Indeed, Chairman Robb testified that he believed Diehl and Brawley to be guilty of the same offense as plaintiff. ¶ 89. Diehl and Brawley, however, presented a situation different from that of plaintiff.

■ The chief reason given by defendant for treating Diehl and Brawley differently than plaintiff was the fact that Ms. Dadino admitted her misconduct and testified at her disciplinary hearing, while the men denied the charges of expense account fraud

---

**8.** It is also questionable whether a more thorough investigation of Gaffigan would have uncovered significant irregularities, given the results of the Touche Ross audit, ¶ 60, and the Attorney General's investigation, ¶ 93.

and invoked their Fifth Amendment rights. This was the explanation, given by Robb at two separate Audit Committee meetings, why plaintiff was immediately suspended without pay pending the final outcome of her case and the men were not. ¶¶ 113, 116.

The court finds that it was not unreasonable for the DRPA to delay any disciplinary action against the men until such time as the charges against them could be proved. The Board did go so far as to withhold raises which the men had been scheduled to receive, pending the outcome of their cases. ¶ 123. I cannot say that a failure to do more, after having suspended plaintiff, smacks of discriminatory animus.

■ The absence of a confession from Diehl and Brawley was also the proffered reason why those men were able to strike a bargain with the Authority, rather than being fired. Robb testified, and the minutes of several Audit Committee meetings reflect, that the DRPA was under the impression that their inability to subpoena witnesses to testify against Diehl and Brawley would prevent it from terminating the men through an administrative hearing. ¶¶ 88, 110, 113, 116, 117. In fact, the Committee was so advised by attorneys Koslov and Creskoff. ¶¶ 110, 117. I find this to be a credible reason for not firing Diehl and Brawley. The Committee had indications that it would be difficult to call witnesses from the business community to testify voluntarily. While the court need not necessarily agree or disagree with the legal assessment given by Koslov and Creskoff, defendant was entitled to rely on this advice of counsel.

■ It is unquestionable that, as with Gaffigan, the investigation of Diehl and Brawley was poor. I noted at ¶ 58 the difficulty with accepting Auchter's explanation for not conducting a more complete audit of Diehl's and Brawley's receipts. However, even if Auchter had done his job properly and had uncovered more instances of false receipts submitted by Diehl and Brawley, a lack of physical evidence was not what defendant viewed as the obstacle to achieving the discharge of these men.

The DRPA's lack of subpoena power, according to the legal advice received by defendant, was the real stumbling block.

■ Furthermore, defendant's failure to demand repayment from Diehl and Brawley is consistent with what defendant believed to be its inability to prove conclusively the charges against these men. Again, the DRPA relied on attorneys Koslov and Creskoff to negotiate the terms of the plea bargain arrangements.

Finally, several factors belie a finding that the DRPA, in confronting its expense account problems, intentionally treated its male managers more favorably than plaintiff. Most striking among these factors is the firing of Craddock, the month-to-month employee operating out of the Chicago office.

Since Craddock did not have an employment contract entitling him to a pre-discharge hearing, he was terminated immediately after it was discovered that his expense accounts contained discrepencies. Craddock's situation is analogous to plaintiff's, in that, even though the Authority was required to hold a hearing for plaintiff, her confession relieved them of the burden of establishing the charges against her. It seems, therefore, that defendant had no compunction about dismissing an employee, male or female, for expense account fraud, as long as it only involved the mailing of a termination notice or the holding of a perfunctory hearing. It was when the DRPA was required to do more in order to achieve the discharge of a misappropriating employee, such as in the cases of Diehl and Brawley, that defendant apparently found itself in over its head.

Additionally, the DRPA's sending of notices of charges to Diehl and Brawley which sought their dismissal, ¶ 82, reflects an initial intention on the part of the Board to deal with these men the same way it had dealt with plaintiff. Defendant also hired Touche Ross to do an independent audit, ¶ 43, and a private investigator, ¶ 114, apparently in an effort to compile enough evidence against Diehl and Brawley to effect their discharge. The fact that defend-

ant was never able to realize this goal is more a sad commentary on the capabilities of a governmental entity charged with the public trust than it is an indication of discriminatory conduct.

I also cannot infer that Diehl and Brawley were the objects of favoritism, in light of the Audit Committee's decision to refer their cases to the New Jersey State Attorney General for possible criminal prosecution. ¶ 86. The Committee twice instructed its attorney to urge the Attorney General's office to investigate Diehl and Brawley, ¶¶ 86, 112, and was apparently willing, as Chairman Robb testified, "to let the chips fall as they may." ¶ 88.

Along the same lines, the minutes of some Audit Committee and Board meetings evince a strong reluctance on the part of several of the commissioners to settle for a plea bargain with Diehl and Brawley. ¶¶ 112, 113, 119, 123. I am cognizant of the fact that such minutes can, at times, be inaccurate or self-serving. It is also quite possible that, had the Commissioners of the DRPA approached the Authority's expense account problems with the same diligence and care with which they attend their own businesses and affairs, this entire litigation may have been averted. Nonetheless, this court is not persuaded, on the record before it, that the DRPA commissioners intended all along not to fire Diehl and Brawley and that they sought to disguise this true intention by manufacturing misleading minutes over a period of several months.

## V. CONCLUSION

This case has its share of ironies, not the least of which is the fact that, had Loretta Dadino kept quiet about falsifying her expense accounts, she might well be working for the DRPA today, perhaps even in a position like Brawley's, with responsibility for supervising and reviewing the expense account practices of others. This situation may be unfair, but it is not the type of inequity for which Title VII provides a remedy.

An appropriate order will be entered.

This matter having come before the court on April 11, 1988 for trial by jury of plaintiff's claims of employment discrimination, asserted under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1983, and New Jersey State law; and

The court having conducted a trial before a jury for four days, at which time plaintiff withdrew her § 1983 and state law claims, and the court dismissed the jury; and

The court thereafter having sat as both the finder of fact and the arbiter of the applicable law for the remaining three days of trial; and

The court having reviewed the submissions and oral argument of the parties; and

For the reasons stated in the court's Findings of Fact and Conclusions of Law filed this date;

IT IS on this 22nd day of August, 1988 HEREBY ORDERED that a judgment of NO CAUSE FOR ACTION is entered in favor of defendant.

No costs.